LABORERS' PENSION FUND and )
LABORERS' WELFARE FUND OF THE )
HEALTH AND WELFARE DEPARTMENT )
OF THE CONSTRUCTION AND GENERAL )
LABORERS' DISTRICT COUNCIL OF )
CHICAGO AND VICINITY, and JAMES S. )
JORGENSEN, Administrator of the Funds, )
                                     )
                  Plaintiffs, )      **Case No. 12 C 2514**
      v. )
                                       )      **Judge Zagel**
JACOBS & SON, INC., an Illinois corporation, )
and KENNETH M. JACOBS, individually, )
                                     )
                  Defendants. )

## MOTION TO REINSTATE AND CONFESS JUDGMENT

NOW COME Plaintiffs Laborers' Pension Fund and Laborers' Welfare Fund of the

Health and Welfare Department of the Construction and General Laborers' District Council of

Chicago and Vicinity and James S. Jorgensen, Administrator of the Funds (hereinafter

collectively "Funds"), by and through their attorney, Patrick T. Wallace, and hereby move this

Court to reinstate the case and enter an Order enforcing the Settlement Agreement entered into

by the parties in the above-captioned matter. In support of this Motion, Plaintiffs state as

follows:

1.        The parties reached settlement in this case and entered into an Installment Note

("Note"), Guaranty of Payment and Indemnification, Commercial Security Agreement and

Contract for Cash Bond. The Settlement Agreement and Stipulation to Dismiss was filed by the

parties requesting that the Court dismiss the matter without prejudice retaining jurisdiction to

enforce the terms of the Settlement Agreement up and through September 30, 2014. The Court

granted the parties' motion. A true and accurate copy of the Court's Order is attached hereto as Exhibit A.

2. The Company has defaulted on its obligations under the terms of the Note. Specifically, the Company has failed to submit timely installment payments for March through September 2013, has failed to submit the October 2013 installment payment, and has failed to submit current benefit and dues reports for the period of August 2013 forward. Accordingly, the Note is in default and the Defendants owe $80,266.00 on the defaulted Note representing accelerated payments and liquidated damages on late or unpaid installments. See Affidavit of James Fosco attached hereto as Exhibit B, ¶ 6.

3. The Company also entered into a Contract for Cash Bond and has failed to make its September 2013 installment. The Company owes a balance of $2,500.00 on the Contract for Cash Bond. See Exhibit B, ¶ 7.

3. Accordingly, Plaintiffs respectfully request that the Court reinstate this case and enter judgment in favor of Plaintiffs and against Defendants Jacobs & Son, Inc. and Kenneth M. Jacobs in the total amount of $81,558.50 representing the $80,266.00 due on the Note including accelerated amounts and liquidated damages due for late payments and $1,292.50 representing Plaintiffs' attorneys' fees and expenses in enforcing the Note and moving to reinstate the case. See Declaration of Patrick T. Wallace, Exhibit C, ¶ 15.

WHEREFORE, Plaintiffs respectfully request that the Court reinstate the case and enter judgment in favor of Plaintiffs and against Defendant Jacobs & Son, Inc. and Kenneth M. Jacobs in the amount of $81,558.50 representing all amounts due on the Note including accelerated amounts, liquidated damages and attorneys' fees and expenses incurred by the Funds. Plaintiffs

also request that Defendants be ordered to pay post-judgment interest from the date of the

Judgment Order until the judgment is paid in full.

Respectfully submitted,

October 25, 2013

Laborers' Pension Fund, et al.

By: /s/ Patrick T. Wallace

Office of Fund Counsel
Laborers' Pension and Welfare Funds
111 W. Jackson Blvd., Suite 1415
Chicago, IL 60604
(312) 692-1540

## CERTIFICATE OF SERVICE

The undersigned certifies that he caused a copy of the foregoing Motion to Reinstate and Confess Judgment to be served upon the following persons via the Court's electronic notification system this 25th day of October 2013.

Todd A. Miller
Kathleen M. Cahill
Allocco, Miller & Cahill, P.C.
3409 North Paulina Street
Chicago, IL 60657

/s/ Patrick T. Wallace

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LABORERS' PENSION FUND and )
LABORERS' WELFARE FUND OF THE )
HEALTH AND WELFARE DEPARTMENT )
OF THE CONSTRUCTION AND GENERAL )
LABORERS' DISTRICT COUNCIL OF )
CHICAGO AND VICINITY, and JAMES S. )
JORGENSEN, Administrator of the Funds, )
                      )
           **Plaintiffs,** )      Case No. 12 C 2514
                      )
    v.                   )
                      )      Judge Zagel
JACOBS & SON, INC., an Illinois corporation, )
and KENNETH M. JACOBS, individually, )
                      )
           **Defendants.** )

## ORDER - DISMISSAL

This matter having come before the Court on the parties' Settlement Agreement and Stipulation to Dismiss ("Settlement Agreement"), due notice having been given, IT IS HEREBY ORDERED:

1.      That this matter is dismissed without prejudice. The Court will retain jurisdiction to enforce the terms of the Settlement Agreement including the Note, Guaranty of Payment and Indemnification, Commercial Security Agreement, and Contract for Cash Bond against Defendants Jacobs and Son, Inc. and Kenneth M. Jacobs up and through September 30, 2014

2.      Unless a timely motion is filed to reinstate the matter before September 30, 2014, the matter shall be dismissed with prejudice except that the dismissal will be without prejudice to the Funds' right to conduct an audit of the Company's books and records for the period of



December 1, 2009 forward and to collect any additional unpaid contributions, dues, wages, interest, liquidated damages or audit costs revealed as due and owing therein.

3.      Further, unless a timely motion is filed to reinstate the matter before September 30, 2014, this matter shall be dismissed without prejudice to the Funds' right to enforce the terms of the Guaranty of Payment and Indemnification and Commercial Security Agreement against Defendants Jacobs and Son, Inc. and Kenneth M. Jacobs on any additional liabilities that are due or may come due under the terms of the Guaranty of Payment and Indemnification and Commercial Security Agreement.

ENTER:

James B. Zagel

The Honorable Judge James B. Zagel
United States District Court Judge

Dated:    NOV 3 0 2012

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| LABORERS' PENSION FUND and<br>LABORERS' WELFARE FUND OF THE<br>HEALTH AND WELFARE DEPARTMENT<br>OF THE CONSTRUCTION AND GENERAL<br>LABORERS' DISTRICT COUNCIL OF<br>CHICAGO AND VICINITY, and JAMES S.<br>JORGENSEN, Administrator of the Funds,<br><br>Plaintiffs,<br><br>v.<br><br>JACOBS & SON, INC., an Illinois corporation,<br>and KENNETH M. JACOBS, individually,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 12 C 2514<br>)<br>)  Judge Zagel<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF JAMES FOSCO

JAMES FOSCO, being first duly sworn on oath, deposes and states as follows:

1.     I am a Field Representative employed by the Laborers' Pension Fund and the Laborers' Welfare Fund of the Construction and General Laborers' District Council of Chicago and Vicinity (hereinafter collectively referred to as the "Funds"), Plaintiffs in the above-referenced action. My responsibilities include oversight of the collection of amounts owed by Defendant Jacobs & Son, Inc. (hereinafter "Jacobs & Son" or the "Company"). This Affidavit is submitted in support of the Laborers' Funds' Motion to Reinstate and Confess Judgment. I have personal knowledge regarding the statements contained herein.

2.     On July 29, 1998, the Company signed an Independent Construction Industry Collective Bargaining Agreement ("Agreement") with the Construction and General Laborers' District Council of Chicago and Vicinity ("District Council") and Laborers' Local Union No. 1006. A true and accurate copy of the Agreement is attached hereto as Exhibit B-1. Pursuant to



the terms of the Memoranda, the Company is bound to the terms of the relevant collective bargaining agreements incorporated by reference in the Agreement and the Funds' respective Agreements and Declarations of Trust.

3.    Pursuant to agreement, the Funds have been duly authorized to act as collection agents on behalf of the District Council for union dues owed to the District Council.

4.    The Agreement and the Funds' respective Agreements and Declarations of Trust to which the Company is bound require that the Company submit benefit reports and contribution payments by the tenth day of the following month. Payments which are not received within thirty days of this date are assessed liquidated damages in the amount of 10 percent or 20 percent liquidated damages (on Pension, Welfare and Training Fund contributions coming due after June 1, 2007) of the principal amount of delinquent contributions, and interest at a rate of 12 percent compounded annually from the date of delinquency forward. The Agreement and the Funds' respective Agreements and Declarations of Trust also obligate the Company to submit its books and records to the Funds for periodic audits to determine benefit contribution compliance. A copy of the relevant portions of the Agreement are attached as Exhibit B-2; a copy of the relevant portions of the Amended Agreement and Declaration of Trust creating the Laborers' Pension Fund are attached as Exhibit B-3; and a copy of the relevant portions of the Amended Health and Welfare Department of the Construction and General Laborers' District Council are attached as Exhibit B-4.

5.    The Company entered into an Installment Note ("Note") to pay certain amounts due to the Funds for contributions for the period of November and December 2011 and May and June 2012. The Note was guaranteed by Kenneth M. Jacobs pursuant to a Guaranty of Payment

and Indemnification and both Kenneth M. Jacobs and the Company entered into a Commercial Security Agreement. The Company also entered into a Contract for Cash Bond. A true and accurate copy of the Settlement Agreement which includes the Note, Guaranty of Payment and Indemnification, Commercial Security Agreement, and Contract for Cash Bond are attached hereto as B-5.

6.      The Company failed to submit timely installment payments due under the Note for the period of March 2013 through August 2013 and has failed to submit the Company's September 2013 Installment Note payment. In addition, the Company has failed to submit and payment benefit and dues reports for the period of August 2013 forward. Accordingly, Defendants owe the following amounts on the defaulted Installment Note:

| | |
|---|---|
| Unpaid and Accelerated Installments from Oct. 2013 through Aug. 2014: | $70,073.52 |
| Accumulated liquidated damages on late-paid Note payments from March 2013 through September 2013 and late October 2013 Note payment: | $10,192.48 |
| TOTAL: | $80,266.00 |

7.      The Company owes a balance on the Contract for Cash Bond in the amount of $2,500.00.

FURTHER AFFIANT SAYETH NOT.

_Jim Fosco_
James Fosco

Subscribed and sworn to before me
this **25th** day of October 2013.

_Eugenia Mashos_
Notary Public

"OFFICIAL SEAL"
EUGENIA MASHOS
Notary Public, State of Illinois
My Commission Expires 09/12/16

3



**HEADQUARTERS OF**
# Construction & General Laborers'
## District Council of Chicago and Vicinity

Affiliated with the Laborers International Union of North America, A.F. of L. - C.I.O. -
6121 WEST DIVERSEY AVENUE · CHICAGO, ILLINOIS 60639 · PHONE: 773-237-7537 · FAX: 773-237-3417

LOCALS 1, 2, 4, 5, 6, 25, 75, 76, 96, 118, 149, 152, 225, 269, 288, 582, 681, 1001, 1006, 1035, 1092



2006

### INDEPENDENT CONSTRUCTION INDUSTRY
### COLLECTIVE BARGAINING AGREEMENT

It is hereby stipulated and agreed by and between **Jacobs & Son Inc.** , herein called the "EMPLOYER", and the CONSTRUCTION AND "GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, herein called the "UNION", representing and encompassing Local Nos. 1, 2, 4, 5, 6, 25, 75, 76, 96, 118, 149, 152, 225, 269, 288, 582, 681, 1001, 1006, 1035, 1092 and encompassing the geographical area of the counties of Cook, Lake, DuPage, Will, Grundy, Kendall, Kane, McHenry and Boone, in the State of Illinois, together with any other locals which may come within the jurisdiction of the UNION, that:

1. **EMPLOYER**, in response to the UNION's claim that it represents an uncoerced majority of each EMPLOYERS' laborer employees, acknowledges and agrees that there is in good faith doubt that the UNION has been authorized to and in fact does represent such majority of laborer employees. Therefore, the UNION is hereby recognized as the sole and exclusive collective bargaining representative for the employees now or hereafter employed in the bargaining unit with respect to wages, hours of work and other terms and conditions of employment in accordance with Section 9 of the National Labor Relations Act without the need for a Board certified election.

2. The EMPLOYER affirms and adopts the Collective Bargaining Agreements between the UNION and the Builders Association of Chicago and Vicinity, the Illinois Road Builders Association, the Underground Contractors Association, the Mason Contractors Association of Greater Chicago, the Concrete Contractors Association of Greater Chicago, B.O.C.N.I./C.A.W.C.C., the Lake County Contractors Association, the Contractors Association of Will and Grundy Counties, the Fox Valley General Contractors Association, the Chicago Demolition Contractors' Association, the Illinois Environmental Contractors Association, and all other Associations with whom the District Council of any of its affiliated local unions has a duly negotiated agreement, and re-establishes all agreements from June 1, 1976 together with all amendments thereto. Where no current Association agreement is negotiated, the terms of the most recent expired agreement are incorporated herein until a current agreement exists that shall be incorporated retroactively herein. It is further agreed that where a contractor works in the jurisdiction of any local UNION, then the Association agreement covering the local UNION is herein specifically incorporated in this agreement and shall supersede the standard District Council agreements in the case of any conflict between the District Council agreement and the local Association agreement. Nothing herein shall limit the jurisdiction of this Agreement to less than that provided in this Agreement.

3. The EMPLOYER agrees to pay the amounts that it is bound to pay under said Collective Bargaining Agreements to the HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, the LABORERS' PENSION FUND, the CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY TRAINING TRUST FUND, the CHICAGO AREA LABORERS-EMPLOYERS COOPERATION EDUCATION TRUST ("LECET"), and to all other designated Union-affiliated benefit funds, and to become bound by and be considered a party to the Agreements and Declarations of Trust creating said Trust Funds as if it had signed the original copies of the Trust instruments and amendments thereto. The EMPLOYER ratifies and confirms the appointment of the EMPLOYER Trustees who shall, together with their successor Trustees, designated in the manner provided in said Agreements and Declaration of Trusts and jointly with an equal number of Trustees appointed by the UNION, carry out the terms and conditions of the Trust instruments.

The EMPLOYER further affirms that all prior contributions paid to the Welfare, Pension, Training and LECET Funds were made by duly authorized agents of the EMPLOYER at all proper rates, for the appropriate periods of time, and that by making said union contributions the EMPLOYER evidences the intent to be bound by the terms of this Agreement and Collective Bargaining Agreements which were operative at the time the contributions were made, acknowledging the report form to be a sufficient instrument in writing to bind the EMPLOYER to the applicable agreements.

4. Employees covered by this Working Agreement shall retain all the work traditionally performed by members of the UNION. The EMPLOYER agrees that it will not cause any such traditionally performed work to be done at a construction site by employees other than those covered by this Memorandum of Agreement, except with the prior written consent of the UNION. Any EMPLOYER, whether acting as a contractor, general manager or developer, who contracts out or sublets any of the work coming within the jurisdiction of the UNION, shall assume the obligations of any such subcontractor for prompt payment of employees' wages and other benefits, including reasonable attorneys' fees incurred in enforcing the provisions hereof. Notwithstanding any agreement to the contrary, the EMPLOYER'S violation of any provision of this paragraph will give the UNION the right to take any other lawful action, including all remedies at law or equity.

5. In the event of any change in the ownership, management or operation of the EMPLOYER'S business by sale or otherwise, it is agreed that as a condition of such transfer or change that the new owner and management shall be fully bound by the terms and conditions of this Agreement. This Agreement is applicable to all successors and transferees of the EMPLOYER, whether corporate or otherwise. The EMPLOYER shall provide ten (10) days prior notice to the Union of the sale or transfer.

6. The negotiated wage and fringe benefit contribution rates in the various Collective Bargaining Agreements are as follows:

Effective June 1, 1998 Per Hour Wages
to
May 31, 1999
$ 23.36 Per Hour Wages
$ 3.27 Per Hour Health and Welfare Fund
$ 2.05 Per Hour Pension Fund
$ .10 Per Hour Training Fund (plus additional amounts in Association agreement)
$ .02 Per Hour MCIAF (if applicable in Association agreement)
$ .02 Per Hour LECET (to be deducted from MCIAF if LECET contribution if not provided in Association agreement)
$ .01 Per Hour Chicagoland Salary Council (if applicable)
In addition, the Employer shall pay other amounts if provided in appropriate Association agreements for industry funds.

June 1, 1999
to
May 31, 2000
$ 1.25 Per Hour Increase for the year June 1, 1999 through May 31, 2000 to be allocated between wages and fringe benefits by the Union in its sole discretion. Welfare, Pension, Training and LECET Funds contributions to remain the same unless additional sums are allocated.

June 1, 2000
to
May 31, 2001
$ 1.35 Per Hour Increase for the year June 1, 2000 through May 31, 2001, to be allocated between wages and fringe benefits by the Union in its sole discretion. Welfare, Pension, Training and LECET Funds contributions remain the same unless additional sums are allocated.

All additional wage rates, dues checkoff, and fringe benefits that are negotiated or become effective after May 31, 2001, shall be incorporated in this Memorandum of Agreement.

7. Effective June 1, 1998, all EMPLOYERS covered by this Memorandum of Agreement incorporating the various Collective Bargaining Agreements shall deduct from the wages of employees covered by the said contract, uniform working dues in the amount of 1.5% of gross wages, or as determined by the UNION, and shall remit monthly to the UNION office designated by the EMPLOYER by the District Council the sums so deducted, together with an accurate list of employees from whom wages and dues were deducted and the amounts applicable to each employee, not later than the 15th day of the month following the month for which said deductions were made.

It is the intention of the parties that such deductions shall comply with the requirements of Section 302(c)(4) of the Labor Management Relations Act of 1947, as amended and such deductions be made only pursuant to written agreements from each employee on whose account such deductions are made, which assignment shall not be irrevocable for a period of more than one year or beyond the termination date of the Memorandum of Agreement, whichever occurs sooner.

9. This Agreement shall remain in full force and effect through May 31, 2001 (unless an applicable Association agreement is of longer duration) and shall continue thereafter unless there has been given written notice, by registered or certified mail by either party hereto, received no less than sixty (60) nor more than ninety (90) days prior to the expiration date, of the desire to modify or amend this Agreement through negotiations. In the absence of such notice the EMPLOYER and the UNION agree to be bound by the new area-wide negotiated agreement and amendments incorporating them into this Agreement and extending this Agreement for the life of the newly negotiated contracts.

10. The EMPLOYER acknowledges and accepts the facsimile signatures on this contract as if they were the original signatures. The EMPLOYER further acknowledges receipt of a copy of the complete Joint Working Agreement. Upon request of the UNION, the EMPLOYER shall execute another agreement that reflects the final contract settlements incorporated herein.

Dated **July 29** , **1998**
month / day /      year

ACCEPTED:

Laborers' Local Union No. **1006**

By: _____

CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY

By: *(signature)*
Robert E. Bloch, Trustee

For Office Use Only: _____

**Jacobs & Son Inc.**
(Employer)

By: **Kenneth M. Jacobs Secretary**
(Print Name and Title)

*(signature)*
(Signature)

**111 Selk Road**
(Address)

**Elk Grove Village IL 60007**
(City, State and Zip Code)

**(847) 824-4701**
(Telephone)

**EXHIBIT**
**B-1**
tabbies

TRUST FUND

JUNE 1, 2010 TO MAY 31, 2013

# AGREEMENT

between the

ILLINOIS SMALL PAVERS ASSOCIATION

and the

CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL
OF CHICAGO AND VICINITY

1



EXHIBIT
tabbies
B-2

# Article V
## WAGES

**Paragraph 1.** The rates of wages exclusive of fringe benefits to be paid in this trade for the period June 1, 2010 to and including May 31, 2013, shall be as set forth below for the respective following classifications as further defined herein.

The wage rates include a total economic increase of $1.75 per hour effective June 1, 2010 to May 31, 2011 (to be allocated to fringe benefits only by the Union in its sole discretion) for a wage rate of $35.20 per hour, which includes the dues deduction; June 1, 2011 to May 31, 2012, $1.80 per hour total economic increase to be allocated to fringe benefits only by the Union in its sole discretion; June 1, 2012 to May 31, 2013, $1.85 per hour total economic increase to be allocated between wages, fringe benefits and other funds by the Union in its sole discretion; The foregoing allocations may include allocations to LECET and LDC/LMCC.

| CLASSIFICATION | 6/01/10 | 6/01/11 | 6/01/12 |
|---|---|---|---|
| Laborers and Helpers | $35.20 | $1.80* | $1.85** |
| Rakers and Lutemen | 35.475 | | |
| Machine-Screwmen | 35.475 | | |
| Asphalt Tampers and Smoothers | 35.475 | | |
| Kettlemen | 35.475 | | |
| Mixermen | 35.475 | | |
| Drum-Men | 35.475 | | |
| Jackhammermen (Asphalt) | 35.475 | | |
| Paintmen | 35.475 | | |
| Mitre Box Spreaders | 35.475 | | |
| Laborers on Birch, Overman and Similar Spreader Equipment | 35.475 | | |
| Laborers on Apsco | 35.475 | | |
| Laborers on Air Compressors | 35.475 | | |
| Material Expeditor (Asphalt Plant Laborers) | 35.20 | | |
| Paving Form Setters | 35.475 | | |
| Jackhammerman (Concrete) | 35.475 | | |

*to be allocated to fringe benefits only by the Union in its sole discretion (See above paragraph)

**to be allocated between wages and fringe benefits by the Union in its sole discretion (See above paragraph)

9

Power Drive Concrete Saws,
Other Power Equipment .........35.475
Cement Gun Nozzle (Laborers)
Gunite .......................35.35
Cement Gun Laborers ...........35.275
Street Paving, Grade Separation,
Sidewalk Curb and Gutter
Strippers and all Other
Laborers ....................35.20
General Foreman of Laborers ......36.775
Superintendent .................36.775
Foremen of Laborers ...........36.35
Asphalt Foreman ...............36.35
Cut-Out Foreman ...............36.35
Street Repair Foreman ..........36.35
Material Testing/Quality Control
Laborer ................per side letter

| | | |
|---|---|---|
| Apprentices (1st 6 months) .... | 60% of base rate: | ($21.12) |
| Apprentices (2nd 6 months).... | 70% of base rate: | ($24.64) |
| Apprentices (3rd 6 months) .... | 80% of base rate: | ($28.16) |
| Apprentices (4th 6 months) .... | 90% of base rate: | ($31.68) |
| Apprentices (after 24 months) .. | 100% of base rate: | ($35.20) |

Wages must be paid by payroll check and shall include a stub or statement showing the number of straight time and overtime hours worked and rate of pay.

**Direct Deposit.** In lieu of paying wages by payroll check, the Employer may make payment by electronic bank draft if the employee voluntarily accepts such alternate method of payment. The Employer shall not mandate electronic banking as a condition of employment. Electronic wage payments must be transferred to the employee's bank account no later than the employee's regular pay day and at no cost to the employee. If payment is made by electronic bank draft, the Employee must also be provided a record of hours worked, rates of pay, and deductions made, at the same time and containing the same information as if wages were paid by payroll check.

If full wages are not timely transferred to the employee's account, the Employer shall pay the employee an additional four (4) hours pay for each day or portion thereof until full wages are received. Employers who violate the provisions of these paragraphs shall be denied the use of electronic banking for wage payments.

**Dosimeter Use:** A premium of One ($1.00) Dollar per hour shall be paid to any Laborer required to work with a dosimeter used for monitoring nuclear exposure or with any similar instrument or measuring device.

**Power Pac:** When a Laborer uses a power driven piece of equipment he shall be paid the rate of pay of the tool at the end of the power pac.

**Liquidated Damages:** Payment by the Employer and acceptance by the Employee of less than the wage herein stipulated shall be a violation of this Agreement upon the part of each. Upon conclusive proof to the Joint Grievance Committee of such violation, the Employer shall immediately pay the unpaid balance due in accordance with the wage herein stipulated; and in addition thereto, shall pay as directed by the Joint Grievance Committee an amount no less than fifty percent (50%) of the amount of such pay shortage as just and liquidated damages because of such violation. In cases where an employee was knowingly complicit in the underpayment of wages, none of the liquidated damages assessed against the Employer shall be awarded to that employee.

**Paragraph 2. WELFARE:** Beginning the period from June 1, 2010 to May 31, 2011, the Employer agrees to make Health and Welfare contributions of $10.63 per hour for each hour worked by all Employees covered by this Agreement in addition to the wages herein stipulated. This $10.63 per hour shall be paid to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity or a designated appointee at the end of each month.

That for the periods June 1, 2011 to May 31, 2012; June 1, 2012 to May 31, 2013; that on May 1 of each

year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article V, Paragraph 1).

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity, as well as any amendments thereto.

Paragraph 3. PENSION: Beginning June 1, 2010 the Employer agrees to make a pension contribution of $8.57 per hour for each hour worked by all Employees covered by this Agreement in addition to the wages and welfare payments herein stipulated. This $8.57 per hour shall be paid to the Laborers' Pension Fund or to a designated appointee at the end of each month.

That for the periods June 1, 2011 to May 31, 2012; June 1, 2012 to May 31, 2013; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article V, Paragraph 1).

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Laborers' Pension Fund, as well as any amendments thereto.

The parties agree that the Employer shall make lump sum contributions to employee fringe benefit accounts, administered by the Trustees on behalf of each employee. It is further agreed that such contribution shall be accompanied by a breakdown of payment according to appropriate benefits.

The Trustees of the Welfare Fund and the Trustees of the Pension Fund shall, among other things, have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules govern-

ing entitlement to benefits, and whether and to what extent benefits are to be provided for covered Employees.

The failure of the Employer to contribute to the said Welfare or Pension Fund, as provided herein, shall for the purposes of the remedies the Union may pursue, be deemed the same as the failure of the Employer to pay wages, and the Union shall be permitted to remove workers whom they represent for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

A grace period of thirty (30) days shall be granted for Employers to submit reports and contributions as provided. Said reports and contributions not received during this grace period shall be assessed liquidated damages amounting to ten (10%) percent of the amount of the contributions which are owed. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial, though difficult to ascertain. However, the Employer acknowledges these costs to be at a minimum of ten (10%) percent, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions shall bear interest at a maximum legal rate of interest per annum from the due date until they are paid.

Further, in the event the Trustees refer the account to legal counsel for collection, the delinquent Employer shall be liable for reasonable attorneys' fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

**Reasonable attorneys' fees shall mean:** All reasonable attorneys' fees in the amounts for which the Trustees become legally bound to pay, including recovery of liquidated damages, interests, audit costs, filing fees, and any other expenses incurred by the Trustees.

The Trustees of the aforementioned Welfare and Pension Funds and the Union shall have the authority to

audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is deemed necessary for the purpose of compliance with the provisions of this Agreement, including the obligation to remit Union Dues under Article VII.

Each participating Employer shall make its books and records available to the Trustees for such purpose. In the event the audit discloses that the Employer, during the period of the audit, had underpaid its contributions and/or wages, the Employer shall be liable for the costs of the examination, including but not limited to, audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement.

**Paragraph 4.** Appointment of Trustees to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund. The parties agree that the Employer-appointed trustees of the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund and training and apprentice funds to which Employers are required to contribute shall be appointed solely by Employer associations that enter into collective bargaining agreements with the Union requiring contributions to such funds ("Signatory Associations"). It is further agreed that the Trust Agreements establishing such funds shall be amended to replace any Employer association that appoints a trustee and does not have a labor agreement with the Union, replacing it with a Signatory Association. The union and Signatory Associations shall meet within 30 days of the effective dates of agreements covering a majority of Fund participants to review the appointment of Employer Trustees of the funds. It is agreed that the numbers of hours contributed by Employers represented by Signatory Associations compared to contributions by other Signatory Associations during the preceding year shall be the basis for assigning

the number of trustee appointments. If such parties are unable to agree on the Signatory Associations to be responsible for appointments and the number of appointments to be made by each Signatory Association the dispute shall be submitted to expedited arbitration under Subpart D of the Policies and Procedures of the Federal Mediation and Conciliation Service.

Article III Section 2 of the trust agreements of the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund shall be amended to include the following: "Association-appointed Trustees must be full-time employees of Contributing Employers within the Association's membership. A Contributing Employer shall be defined as an Employer that has employed an average of five (5) or more Laborers performing bargaining unit work for whom contributions have been made per month in each of the previous three (3) calendar years."

The parties agree that the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund will be operated and administered by a board of trustees that is expanded to include 8 employer and 8 union trustees. Appointing authority for the two additional employer trustees shall be vested with new employer associations that currently are not party to the trust agreements and under whose labor agreements more than 20,000 hours of benefits were paid in 2005.

**Paragraph 5. FOX VALLEY FUNDS, RECIPROCITY.** Employers that employ Employees who participate in the Fox Valley Laborers' Health and Welfare Fund and Fox Valley and Vicinity Laborers' Pension Fund (collectively "Fox Valley Funds") may contribute directly to these funds in the amounts allocated for the Fox Valley Funds by the Union from the economic package.

Effective June 1, 2010 such an Employer shall contribute for each hour worked $10.62 per hour to the Fox

Valley Laborers' Health and Welfare Fund and $8.58 per hour to the Fox Valley and Vicinity Laborers' Pension Fund ($19.20 per hour in total). The Union in its sole discretion, shall determine the division of additional contributions to be allocated from the economic package to the Fox Valley Funds in future years, provided that the total amount to be allocated is the same as the total amount allocated to the Health and Welfare Department of the Construction and General Laborers District Council of Chicago and Vicinity and the Laborers Pension Fund.

Employers contributing to the Fox Valley Funds agree to be bound by the Agreements and Declarations of Trust establishing the Fox Valley Funds, as well as any amendments thereto.

The parties agree that, whenever contributions are made on behalf of an Employee to welfare and pension funds that are not the home funds of the Employee, the funds receiving such contributions, in accordance with the funds' Reciprocity Agreement, shall transfer such contributions to the home funds and the home funds shall reallocate the contributions between such home funds in the amounts set forth herein.

**Section 415 Excess Benefit Fund.** A Section 415 Excess Benefit Fund shall be established for the purpose of providing alternative benefit to any employees of the Employer who become unable to receive the entire amount of the accrued pension benefits to which they would be entitled under one or more of the pension plans sponsored by their Employer because of limitations established by Section 415 of the Internal Revenue Code. The Employer may be required and directed by the Board of Trustees of the Excess Benefit Fund to contribute a portion of its agreed-upon "pension" contribution to the Section 415 Excess Benefit Fund and shall not increase the Employer's cost beyond the amount that the Employer is obligated to contribute to the Laborers' Pension Fund and that the funding of the Section 415 Excess Benefit Fund shall be fully tax deductible to the Employer for

Federal Income Tax purposes. The Employer hereby agrees that the Board of Trustees of any such Section 415 Excess Benefit Fund shall be authorized to determine each year the amount that will be contributed by the Employer and the amount to be credited to the account of any eligible retiree for payment in lieu of accrued benefits that would exceed the limits set by Section 415 of the Internal Revenue Code.

**Chicagoland Laborers' Vacation Fund.** The Employer agrees to be bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Vacation Fund, a jointly-trusteed vacation plan established for the purpose of providing income to members during their winter lay-offs. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

**Chicagoland Laborers' Annuity Fund.** The Employer agrees to be bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Annuity Fund, a jointly-trusteed defined contribution plan providing a supplemental retirement benefit. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

**Paragraph 6. SUPERVISORS:** To the extent permissible by the Internal Revenue Service or any Federal Act, and for the purposes of Paragraphs 2 and 3 of Article V of this Agreement only, the bargaining unit shall also include those persons in the employ of an Employer who are supervisors, as defined in the Labor Management Relations Act, as amended; and who at one time were Employee members of the bargaining unit herein on whose behalf contributions were required to be made to the trust funds described in the aforesaid Paragraphs 2 and 3 of Article V hereof.

**Paragraph 7. Out of Town Work.** When Laborers who reside or work in the nine-county geographic area covered by this Agreement are voluntarily requested to

work at locations outside these nine counties, the Employer shall continue to report and pay benefits for all hours worked outside the nine counties. If the work performed is covered under a labor agreement with the Laborers' International Union of North America or its affiliates, the Employer shall report and pay the benefit contributions to the fringe benefit fund identified, and the contribution rates specified, under that labor agreement. If the work performed is not covered under a labor agreement with the Laborers' International Union of North America or its affiliates, then the Employer shall report and pay the benefit contributions to the fringe benefit funds identified, and the contributions rates specified, under this Agreement. No employee shall be obligated to accept out of town employment or subject to retaliation for refusing such work.

**Paragraph 8. Special Rules for Bonding.** An employer that is owned or managed, in whole or part, by an individual who currently has or previously had in the last ten (10) years ownership or principal managerial responsibility for another contributing employer that currently is or ceased doing business when delinquent to the Funds shall be required to post for the benefit of the Funds an additional cash bond or obtain a surety bond from a Fund-approved insurer in an amount equal to twice the amount of the other contributing employer's delinquency. This amount may be adjusted by the Benefit Fund Trustees for each individual employer. This bond shall be in addition to and separate from the bond required elsewhere in this Agreement.

**Paragraph 9. Withdrawal of Employees.** If the Employees are withdrawn from any job in order to collect contributions to the Laborers' Health and Welfare, Pension and/or Apprenticeship and Training Funds, the Employees who are affected by such stoppage of work shall be paid for lost time up to sixteen (16) hours, provided that two (2) days' written notice of intention to remove employees from the job is given to the Employer by the Union. These lost time amounts may be collected

18

only from the contractor with whom the Union has a dispute and not from any other entity. The foregoing shall not apply if the Employer has made payment on behalf of the affected employees to another fringe benefit fund under a labor agreement of a union affiliated with the Building and Construction Trades Department, AFL-CIO.

## Article VI
## BONDING TO GUARANTEE WAGE PAYMENTS AND WELFARE AND PENSION CONTRIBUTIONS

**Paragraph 1.** All Employers shall procure, carry and maintain a surety bond in form and amount satisfactory to the Union, but not less than in the principal sum of $5,000.00, to guarantee payment of wages, Pension and Welfare Trust contributions, during the term of this Agreement.

**Paragraph 2.** If the Employer employs between seven (7) and ten (10) Laborers, the surety bond shall be increased to $15,000. If the Employer employs between eleven (11) and twenty (20) Laborers, the surety bond shall be increased to $25,000. If the Employer employs twenty-one (21) to forty (40) Laborers, the surety bond shall be increased to $35,000. If the Employer employs forty-one (41) or more Laborers, the surety bond shall be increased to $45,000.

**Paragraph 3.** The Employer shall be required to obtain an appropriate bond within thirty (30) days of executing this Agreement, which bond may also be posted in cash. Should the Employer fail to comply with the provisions of this Article, the Union may withdraw its employees or strike until such compliance occurs, and the Employer shall further be liable for all costs, including attorneys fees, incurred in enforcing these provisions.

**Paragraph 4.** The Employer shall give notice to the Union and the appropriate Fund Office in writing not later than ten (10) days after the occurrence of any of the following events relating to the Employer, occurring after the date hereof:

(a) Formation of Partnerships;

(b) Termination of business;

(c) Change of name commonly used in business operation;

(d) Change in form of business organization;

(e) Incorporation of business;

(f) Dissolution of corporation;

(g) Name and business organization of successor; and

(h) Admission to or withdrawal from any association operating as a multi-employer bargaining unit.

**Paragraph 5. Withdrawal of Employees.** If the Employees are withdrawn from any job in order to ensure compliance with the provisions of this Article, the Employees who are affected by such stoppage of work shall be paid for lost time up to sixteen (16) hours, provided that two (2) days' written notice of intention to remove employees from the job is given to the Employer by the Union. These lost time amounts may be collected only from the contractor with whom the Union has a dispute and not from any other entity. The foregoing shall not apply if the Employer produces the required bond before expiration of the 2-day notice period.

## Article VII
## CHECK-OFF & DUES DEDUCTIONS

**Paragraph 1.** Employers also agree to deduct from the net earnings payable to an Employee covered by this Agreement, initiation fees and quarterly Union dues insofar as permitted by state and federal laws upon receipt and in accordance with a duly executed authorization form from the Employees. Said authorization form shall not be revocable for a period of more than one (1) year or prior to the termination date of this Agreement, whichever occurs sooner.

**Paragraph 2.** All Employers covered by this Agreement shall deduct from the wages of Employees covered

by said contract, working dues in the amount of one and one-half percent (1.5%) of gross wages or such amount approved by the Union for each hour worked and shall remit monthly to the Union office the sums so deducted, together with an accurate list of Employees from whose wages said dues were deducted and the amounts applicable to each Employee, not later than the 10th day of the month next following the month for which such deductions were made. Dues remittance reports shall include a report of the hours worked and wages earned by each Laborer. Employers who fail to timely remit Union dues shall be assessed an additional ten percent (10%) liquidated damages.

Paragraph 3. The Union will submit to the Employer a written statement of respective amount of initiation fees and Union dues due the Union. The Employer will then deduct said amounts from each Employee's pay every weekly pay period until the total amount of initiation fees and dues have been deducted. Deductions from the weekly wages shall be not less than Twenty-five ($25.00) Dollars per week to apply to initiation fees and dues until fully paid.

Paragraph 4. Deductions shall be remitted to the Union or to a designated appointee of the Employer promptly, and the Local Union shall acknowledge receipt of the money. The Employer shall furnish the Union with a record of those for whom deductions have been made, the amount of the deductions, and a list of absentees.

Paragraph 5. Employees may authorize deductions of more than the aforesaid Twenty-five ($25.00) Dollars per week, if they so desire, in order to complete early payment of initiation fees and quarterly dues.

Paragraph 6. It is the intention of the parties that such deductions shall comply with the requirements of Section 302(c)(4) of the Labor Management Relations Act of 1947, as amended, and that such deductions be made only pursuant to written assignments from each Employee on whose account such deductions are made,

which assignment shall not be revocable for a period of more than one (1) year, or prior to the termination date of this Agreement, whichever occurs sooner.

**Paragraph 7.** The Union agrees that it will indemnify and hold harmless the Employer from any and all claims, suits, causes of action, or otherwise, as regards the creation and administration of the dues check-off established by this Article and such indemnity and agreement to hold harmless shall include the payment of costs and attorneys' fees on behalf of the beneficiaries of such indemnity.

**Paragraph 8.** Should any Employer fail to remit dues to the Union as required under this Agreement, the Employer shall be liable for and pay all costs of collection, including reasonable audit expenses and reasonable attorney fees and costs. The Union may file suit, or remove employees that it represents, or both, for non-remittance or underpayment of dues by an Employer.

**Paragraph 9. Laborers Political League.** The Employer will deduct an amount designated by the Union for each hour that an employee receives wages under the terms of this Agreement on the basis of individually signed voluntary authorized deduction forms and shall pay over the amount so deducted to the Laborers' Political League ("LPL") or to a designated appointee, not later than the 10th day of the month next following the month for which such deductions were made. LPL remittances shall include a report of the hours worked by each Laborer for whom deductions are made. Remittances shall be made by a separate check payable to the Laborers' Political League. The Employer shall be paid a processing fee each month from the total amount to be transmitted to the LPL to be calculated at the Illinois Department of Revenue standard.

## Article VIII
## INDUSTRY FUNDS

**Paragraph 1.** Each Employer shall pay into the ILLI-NOIS SMALL PAVERS ASSOCIATION (hereinafter

sometimes referred to as the "Industry Fund"), or such other fund as ISPA may in its sole discretion designate at any time during the term of this Agreement, the amount of eight cents ($.08) for each hour worked for the Employer by those of his Employees covered by this Agreement.

Each Employer shall pay into the Chicago-Area Laborers-Employers Cooperation and Education Trust ("LECET"), the amount of seven cents ($.07) for each hour worked for the Employer by those of his Employees covered by this Agreement.

Each Employer shall pay into the Laborers' District Council Labor-Management Cooperation Committee ("LDC/LMCC"), the amount of twelve cents ($.12) for each hour worked for the Employer by those of his Employees covered by this Agreement.

**Paragraph 2.** The Employer agrees to be bound by the Agreement and Declaration of Trust establishing the Industry Fund, as well as any amendments thereto, and agrees to be bound by all actions taken by the Trustees of said Industry Fund pursuant to said Agreement and Declaration of Trust and amendments thereto. The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the LECET and LDC/LMCC, as well as any amendments thereto.

**Paragraph 3.** Inasmuch as the existence and utilization of these Industry Fund(s) should result in increased construction and, therefore, in increased construction job opportunities for Employees, the Union agrees to cooperate in assuring that the contributions required by this Article are in fact made by Employers bound by this Agreement.

## Article IX
## STEWARDS

**Paragraph 1.** The parties agree that the following basic principles apply to the selection of a Job Steward:

(1) The Union requires that a Steward must fully protect the interest of the Union.

# RESTATED AGREEMENT

AND

# DECLARATION OF TRUST

CREATING

# LABORERS' PENSION FUND

With Amendments Through
May 31, 2002


EXHIBIT
B-3

(b)  To enforce the provisions of the Pension Plan and the rules and regulations adopted by the Trustees in a uniform manner with respect to individuals similarly situated.

(c)  To determine questions arising under the Pension Plan or this Agreement, including the power to determine the rights of Employees and their Beneficiaries, and their respective benefits, and to remedy ambiguities, inconsistencies or omissions.

## ARTICLE VII

## FUNDING PENSION PLAN BENEFITS

Section I.  IN GENERAL.  In order to fund the benefits provided under the Pension Plan, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees at the times required by that agreement.  The rate of contributions shall be determined by the applicable Collective Bargaining Agreement or Participation Agreement, together with any amendments, supplements or modifications thereto.  Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be the same as the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union which covers Employees performing similar work.  No

Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the provisions of a Collective Bargaining Agreement or Participation Agreement and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer has entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the

liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10%, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments owed by an Employer pursuant to an installment agreement, shall bear interest up to the prime rate of interest plus two points charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority to delegate the collection of contributions to a Collection Committee, which, in its discretion, may assess a lesser or greater amount or waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Fund. The Collection Committee may include trustees of the Laborers' Welfare Fund as members of the Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including court fees, audit fees, investigative costs, etc. The term "reasonable attorneys' fees" as used herein shall mean all

attorneys' fees in the amounts for which the Trustees become legally obligated including recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority, in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees, in lieu of any cash deposit, a bond in an amount not less than Five Thousand Dollars ($5,000.00) or in an amount consistent with the terms of the current collective bargaining agreements. In the event an Employer is repeatedly delinquent in its contribution payments to the Pension Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current collective bargaining agreements, in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such

-27-

other information as the Trustees may reasonably require in connection with the administration of the Trust and Pension Plan. The Trustees may at any time have an audit made by an independent certified public accountant or its representatives of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures developed and communicated by the Administrator from the beginning of such Employer's participation in the Pension Fund forward unless given written authorization by the Administrator upon request to destroy said record. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

## ARTICLE VIII

### FILING CLAIMS AND REVIEW OF DENIALS OF CLAIM

<u>Section 1.</u>    <u>FILING OF A CLAIM.</u>    Claims for the payment of any benefits provided by the Pension Plan shall be filed, in writing, in accordance with the Rules and Regulations set forth in Article 7 of the Pension Plan.

## ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1.   Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2.   Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3.   Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4.   Cash disbursement journals and general ledgers.

5.   Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.

6.   Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7.   Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8.   Daily time records filed by employees or supervisors.

9.   Source documents and lists of job codes and equipment codes.

10.   Certified payrolls for public sector jobs where such payrolls are required.

11.   Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12. Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13. If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above. However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above. In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced. The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

2

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1

1. Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2. Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof. Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3. When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4. An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers**. New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers**. Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers**. Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

4. **Employers Subject to Special Audits.** At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers.** If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers.** Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods. If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers.** Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

# AMENDMENT TO THE
## RESTATED AGREEMENT AND DECLARATION OF TRUST
## CREATING LABORERS' PENSION FUND

WHEREAS, Article XII of the Restated Agreement and Declaration of Trust ("Trust Agreement") of the Laborer's Pension Fund (the "Fund") provides that the Board of Trustees have the authority to amend the Trust Agreement;

WHEREAS, Article IV of the Fund's Trust Agreement sets forth the powers and duties of the Trustees;

WHEREAS, the Trustees have an obligation to protect the interests of the Plan's Participants and to protect the assets of the Fund;

WHEREAS, the Trustees are aware of situations in which contributing Employers have ceased business operations leaving a large indebtedness to the Fund without a reasonable likelihood of the Fund collecting such delinquent contributions;

WHEREAS, the individual officers and owners of some Employers have secured jobs knowing that they will not comply with their legal obligations to the Fund by keeping accurate records of their laborer employees' employment and make all the required contributions to the Fund; and

WHEREAS, such illegal conduct causes substantial losses to the Fund and deprives Employers who comply with its obligations to the Fund of opportunities to secure employment for their laborer employees; and

WHEREAS, the individual officers, partners or owners of some contributing Employers have used various entities to avoid liability to the Fund for contributions that would otherwise be due and then created new companies in order to continue to operate using such illegal practices;

WHEREAS, in some instances such individual officers or owners have accepted employment as a supervisor or manager with another contributing Employer and been responsible for causing such Employers to fail to comply with their obligations to keep accurate records and make all required contributions;

WHEREAS, the Trustees have determined that certain individuals and entities (as hereinafter defined "Deadbeat Employers") who engage in these practices willfully or with reckless disregard for their legal obligations or with repeated incompetence at the expense of their employees and the Fund have caused the Fund to incur large financial losses and employees to lose benefit coverage for which they had worked;

WHEREAS, the Trustees have concluded that such Deadbeat Employers' practices result in unfair competition for other contributing Employers often with the result of enriching

1

themselves and depriving lawful Employers of needed work, and depriving the Fund's participants of benefits;

WHEREAS, it is the desire of the Trustees to amend the Trust Agreement in order expressly to provide that the Fund may impose appropriate protective financial requirements on any Employer that is owned by or that hires a Deadbeat Employer in a managerial or supervisory role;

NOW THEREFORE, the undersigned Trustees of the Fund, pursuant to the authority of Article XII of the Restated Agreement and Declaration of Trust, do hereby adopt the following Amendment to the Restated Agreement and Declaration of Trust effective as of August 1, 2006:

## I.

The following is added as an additional Paragraph under Article I, "Certain Definitions", Section 2, "Employer":

"A "Deadbeat Employer" is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Fund. For purposes of this Section, substantial liability shall not be less than $30,000."

## II.

The following is added as Section (4) to Article VII, "Funding Pension Plan Benefits":

"Section 4.  ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.

(a)    EMPLOYER OWNED BY DEADBEAT EMPLOYER.  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b)    EMPLOYER OPERATED BY DEADBEAT EMPLOYER.  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of

2

the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c)    PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION. The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund. The Notice will provide the Employer with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provisions of subsections (a) or (b), as applicable, as the Employer deems appropriate in order to avoid liability under this Section. Any Employer, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable. Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d)    MISCELLANEOUS PROVISIONS. The bond referenced in this Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer. "

### III.

Except as hereinbefore amended, the Trust Agreement shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the undersigned Trustees have caused this Amendment to be executed on the dates appearing opposite their respective names.

*Charles Cohen*    9-18-06      *Joseph Coconato*   9/13/06
**CHARLES COHEN**      **DATE**      **JOSEPH COCONATO**    **DATE**

*Alan C. Esche*    9/18/06      *James P. Connolly*   9/18/06
**ALAN ESCHE**      **DATE**      **JAMES P. CONNOLLY**    **DATE**

*Robert G. Krug*    9/18/06      *J. Michael Lazzaretto*   9/18/06
**ROBERT G. KRUG**      **DATE**      **J. MICHAEL LAZZARETTO**    **DATE**

   9/18/06      *Frank Riley*   9/18/06
**RICHARD E. GRABOWSKI**      **DATE**      **FRANK RILEY**    **DATE**

   9/18/06      *Larry Wright*   9/18/06
**DAVID H. LORIG**      **DATE**      **LARRY WRIGHT**    **DATE**

   9/18/06      *Jeff Ziemann*   9-18-06
**GARY LUNDSBERG**      **DATE**      **JEFF ZIEMANN**    **DATE**

4

# RESTATED AGREEMENT AND DECLARATION OF TRUST OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

Restated through
July 1, 2003

1



# ARTICLE VI
## EMPLOYER CONTRIBUTIONS

**Section 1.  IN GENERAL.**  In order to fund the Benefits provided for by this Agreement, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees pursuant to regulations established by the Trustees at the times required by that agreement.  The rate of contributions shall be determined by the applicable Collective Bargaining Agreements or Participation Agreements, together with any amendments, supplements or modifications thereto.  Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation Agreement or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be not less than the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union having jurisdiction over the geographic area in which the covered Employees perform their work.  No Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the foregoing provisions of this Section and any such contract or agreement shall be null and void.  It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer had entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement.  All contributions shall be paid in the manner and form required by the Trustees.

**Section 2.  DEFAULT IN PAYMENT OF CONTRIBUTIONS.**  Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments.  The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity.  Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment.  The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed.  All Employers party to or otherwise bound by this Agreement acknowledge that the liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10% waiving the necessity of any additional proof thereof.  In addition, the delinquent contributions and any payments by the Employer pursuant to an installment agreement, shall bear interest, up to the prime rate plus two points, charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied.  The Trustees are hereby given the power and authority, in their discretion, to assess a lesser amount or to waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee of the Board of Trustees and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Welfare

Fund. The Collection Committee may include trustees of the Laborers' Pension Fund as members of such Collection Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, or refuses to provide the records required to be kept by contributing employers or submit to an audit, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including but not limited to, court fees, audit fees and investigative costs. The term "reasonable attorneys' fees" as used herein shall mean all attorneys' fees in the amounts for which the Trustees become legally obligated for actions seeking delinquent contributions, to compel an audit, or for recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees in lieu of any cash deposit a bond in an amount not less than Five Thousand Dollars ($5,000.00), or in an amount consistent with the terms of the current Collective Bargaining Agreement to which the Employer is subject. In the event an Employer is repeatedly delinquent in its contribution payments to the Welfare Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current Collective Bargaining Agreements in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such other information as the Trustees may reasonably require in connection with the administration of the Trust. The Trustees may at any time have an audit made by an independent accounting firm of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures from the beginning of such Employer's participation in the Trust until given written authorization by the Administrator, upon request, to destroy said records. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning the Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

16

## ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1. Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2. Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3. Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4. Cash disbursement journals and general ledgers.

5. Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.

6. Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7. Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8. Daily time records filed by employees or supervisors.

9. Source documents and lists of job codes and equipment codes.

10. Certified payrolls for public sector jobs where such payrolls are required.

11. Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12. Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13. If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above. However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above. In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced. The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1. Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2. Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof. Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3. When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4. An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers.** New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers.** Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**.  If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**.  Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods.  If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**.  Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

# AMENDMENT TO THE
## RESTATED AGREEMENT AND DECLARATION OF TRUST
### OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

WHEREAS, Article XI of the Restated Agreement and Declaration of Trust ("Trust Agreement") provides that the Board of Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity ("Fund") have the authority to amend the Trust Agreement;

WHEREAS, Article IV of the Fund's Trust Agreement sets forth the powers and duties of the Trustees;

WHEREAS, the Trustees have an obligation to protect the interests of the Plan's Participants and to protect the assets of the Fund;

WHEREAS, the Trustees are aware of situations in which contributing Employers have ceased business operations leaving a large indebtedness to the Fund without a reasonable likelihood of the Fund collecting such delinquent contributions;

WHEREAS, the individual officers and owners of some Employers have secured jobs knowing that they will not comply with their legal obligations to the Fund by keeping accurate records of their laborer employees' employment and make all the required contributions to the Fund; and

WHEREAS, such illegal conduct causes substantial losses to the Fund and deprives Employers who comply with its obligations to the Fund of opportunities to secure employment for their laborer employees; and

WHEREAS, the individual officers, partners or owners of some contributing Employers have used various entities to avoid liability to the Fund for contributions that would otherwise be due and then created new companies in order to continue to operate using such illegal practices;

WHEREAS, in some instances such individual officers or owners have accepted employment as a supervisor or manager with another contributing Employer and been responsible for causing such Employers to fail to comply with their obligations to keep accurate records and make all required contributions;

WHEREAS, the Trustees have determined that certain individuals and entities (as hereinafter defined "Deadbeat Employers") who engage in these practices willfully or with reckless disregard for their legal obligations or with repeated incompetence at the expense of their employees and the Fund have caused the Fund to incur large financial losses and employees to lose benefit coverage for which they had worked;

1

WHEREAS, the Trustees have concluded that such Deadbeat Employers' practices result in unfair competition for other contributing Employers often with the result of enriching themselves and depriving lawful Employers of needed work, and depriving the Fund's participants of benefits;

WHEREAS, it is the desire of the Trustees to amend the Trust Agreement in order expressly to provide that the Fund may impose appropriate protective financial requirements on any Employer that is owned by or that hires a Deadbeat Employer in a managerial or supervisory role;

NOW THEREFORE, the undersigned Trustees of the Fund, pursuant to the authority of Article XII of the Restated Agreement and Declaration of Trust, do hereby adopt the following Amendment to the Restated Agreement and Declaration of Trust effective as of August 1, 2006:

I.

The following is added as an additional Paragraph under Article I, "Certain Definitions", Section 2, "Employer":

"A 'Deadbeat Employer' is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Fund. For purposes of this Section, substantial liability shall not be less than $30,000."

II.

The following is added as Section (4) to Article VI, "Employer Contributions":

"Section 4. ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.

(a) EMPLOYER OWNED BY DEADBEAT EMPLOYER. Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b) EMPLOYER OPERATED BY DEADBEAT EMPLOYER. Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of

the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c)     PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION.  The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund.  The Notice will provide the Employer with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provisions of subsections (a) or (b), as applicable, as the Employer deems appropriate in order to avoid liability under this Section.  Any Employer, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable.  Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d)     MISCELLANEOUS PROVISIONS.  The bond referenced in this Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer. "

III.

Except as hereinbefore amended, the Trust Agreement shall remain in full force and effect in accordance with its terms.

3

IN WITNESS WHEREOF, the undersigned Trustees have caused this Amendment to be executed on the dates appearing opposite their respective names.

_____    _____  9/19/06
CHARLES J. GALLAGHER    DATE    JAMES P. CONNOLLY    DATE

_____  9/19/06    _____  9/19/06
ALAN ESCHE    DATE    RANDY DALTON    DATE

_____  9/19/06    _____  9-19-06
RICHARD E. GRABOWSKI    DATE    MARTIN FLANAGAN    DATE

_____  9/19/06    _____  9/19/06
DAVID H. LORIG    DATE    LIBERATO NAIMOLI    DATE

_____  9/19/06    _____  9/19/06
DENNIS MARTIN    DATE    SCOTT PAVLIS    DATE

_____  9/19/06    _____  9/19/06
TIM J. SCULLY    DATE    FRANK RILEY    DATE

4

LABORERS' PENSION FUND and )
LABORERS' WELFARE FUND OF THE )
HEALTH AND WELFARE DEPARTMENT )
OF THE CONSTRUCTION AND GENERAL )
LABORERS' DISTRICT COUNCIL OF )
CHICAGO AND VICINITY, and JAMES S. )
JORGENSEN, Administrator of the Funds, )
)
                  Plaintiffs, )     Case No. 12 C 2514
)
    v. )
)     Judge Zagel
JACOBS & SON, INC., an Illinois corporation, )
and KENNETH M. JACOBS, individually, )
)
               Defendants. )

## SETTLEMENT AGREEMENT AND STIPULATION TO DISMISS

NOW COME Plaintiffs Laborers' Pension Fund and Laborers' Welfare Fund of the

Health and Welfare Department of the Construction and General Laborers' District Council of

Chicago and Vicinity, and James S. Jorgensen, Administrator of the Funds (collectively

"Funds"), by and through their attorney Patrick T. Wallace, and Defendants Jacobs & Son, Inc.

and Kenneth M. Jacobs ("Jacobs & Son" and "Jacobs," respectively), by and through their

attorneys, Todd A. Miller and Kathleen M. Cahill of the firm of Allocco Miller & Cahill, P.C.,

and hereby submit the parties' Settlement Agreement and Stipulation to Dismiss. In support of

this Agreement, the parties state as follows:

    1.    The parties have settled the case pursuant to the terms of an Installment Note,

Guaranty of Payment and Indemnification ("Guaranty"), Commercial Security Agreement

("CSA") and a Contract for Cash Bond, true and accurate copies of which are attached hereto as

Exhibits A, B, C and D.


EXHIBIT
B-5

2.    Under the terms of the Note, the Company will pay contributions owed for the period of November 2011 through December 2011 and May 2012 through June 2012 over the course of twenty-four (24) months with the last payment coming due on August 1, 2014.

3.    Accordingly, the parties respectfully request that the Court dismiss this matter without prejudice and retaining jurisdiction to enforce the terms of the Settlement Agreement up and through September 30, 2014.  Thereafter, the parties request that the matter be dismissed with prejudice except the dismissal be without prejudice to the Funds' right to conduct an audit of the Company's books and records for the period of December 1, 2009 forward and to collect any additional unpaid contributions, dues, wages, interest, liquidated damages or audit costs revealed as due and owing therein.  Further, the parties respectfully request that the matter be dismissed without prejudice to the Funds' right to enforce the terms of the Guaranty and CSA against the Defendants including any additional obligations that may be due or come due under the terms of Guaranty and CSA.

Respectfully submitted,

November 26, 2012                      Laborers' Pension Fund, et al.

By: /s/ Patrick T. Wallace

Office of Fund Counsel
111 W. Jackson Blvd., Suite 1415
Chicago, IL  60604
(312) 692-1540

November 26, 2012

Jacobs & Son, Inc. and Kenneth M. Jacobs, individually,

By: /s/ Todd A. Miller

Allocco, Miller & Cahill, P.C.
3409 N. Paulina
Chicago, IL 60657

## INSTALLMENT NOTE

This Installment Note ("Note") is made between the Laborers' Pension Fund ("Pension Fund") and Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity ("Health and Welfare Fund" or collectively the "Funds"), the parties of the first part, and Jacobs & Son, Inc. (the "Company"), the party of the second part.

WHEREAS, the Company has at all relevant times been party to a collective bargaining agreement ("CBA") with the Construction and General Laborers' District Council of Chicago and Vicinity, whereunder it is obligated to make certain contributions to the above-named Funds, as well as to the Training Fund, on behalf of its covered employees, and to submit payment of all employee union dues:

WHEREAS, the Company has failed to timely pay certain contributions owed to the Funds for the period of November 2011 through December 2011 and May 2012 through June 2012.

WHEREAS, the Company has failed to remit all employee union dues to the Funds, as the designated collection agent for the Construction and General Laborers' District Council of Chicago and Vicinity, for the period of December 2011 and May 2012 through June 2012.

WHEREAS, the Company desires to pay all delinquencies owed to the Funds, to pay all union dues owed to the Construction and General Laborers' District Council of Chicago and Vicinity, together with liquidated damages, and interest, as set forth below and further desires to remain current in its obligation to pay contributions to the Funds.

THE PARTIES HEREBY AGREE as follows:

1. The Company will pay $90,875.03 to the Health and Welfare Fund (comprised of $65,064.42 in delinquent contributions, $13,012.88 in liquidated damages, $560.00 in attorneys' fees and costs and $12,237.73 in interest) (based on an interest rate of 12%). The Company will also pay $65,493.19 to the Pension Fund (comprised of $46,768.58 in delinquent contributions, $9,353.72 in liquidated damages, $560.00 in attorneys' fees and costs and $8,810.89 in interest). All of these amounts shall be paid according to the schedule described below in paragraphs 4 and 5.

2. The Company will also pay $3,040.64 to the Training Fund (comprised of $2,445.05 in delinquent contributions, $489.01 in liquidated damages and $106.58 in interest), $280.77 to the ISPA Fund (comprised of $249.76 in delinquent contributions, $24.98 in liquidated damages and $6.03 in interest), $245.66 to the LECET Fund (comprised of $218.54 in delinquent contributions, $21.85 in liquidated damages and $5.27 in interest), $421.14 to the LDCMC Fund (comprised of $374.64 in delinquent contributions, $37.46 in liquidated damages and $9.04 in interest) and $5,369.88 in union dues (comprised of $3,392.44 in delinquent contributions and $339.24 in liquidated damages and $1,638.20 in accumulated Dues penalties). These delinquent amounts shall be paid in their entirety at the time payment under this Note commences, in accordance with the schedule described in paragraph 4.

3. The Company will also pay the Funds the sum of $1,120.00 representing attorney fees and costs incurred by the Funds in Case No. 12 C 2514. This amount is split equally between Welfare and Pension as described in paragraph 1 above.

4. Simultaneously with the execution of this Note on August 17, 2012, the Company will pay the amounts set forth above in paragraph 2 and $2,021.03 to the Health and Welfare Fund and $1,459.51 to the Pension Fund.

5. For twenty-four (24) consecutive months commencing on September 1, 2012 and ending on August 1, 2014, the Company will pay $3,702.25 per month to the Health and Welfare Fund and $2,668.07 per month to the Pension Fund.

6. The Company will remit all payments to the Funds' Administrative Offices, which are located at 11465 Cermak Road, Westchester, Illinois 60154.

7. The Company understands and agrees that this Installment Note is based on reports submitted by the Company to the Funds and that the Funds reserve the right to conduct an audit, in accordance with the terms of the collective bargaining agreement and the Funds' respective Agreements and Declarations of Trust, to determine benefit contribution compliance for the time period covered herein and further reserve the right to collect any unpaid contributions, union dues, interest, liquidated damages, and audit costs as shown on said audit.



8. Payments made pursuant to this Installment Note shall be considered "contributions" as defined under the terms of the CBA and the Fund's respective Agreements and Declarations of Trust. If the contributions are not paid by the 10th day following the date on which payment should have been received, the contribution shall be considered delinquent and all charges which apply to the late payment of contributions under the terms of the CBA and the Fund's respective agreements and Declarations of Trust apply, including, but not limited to, the assessment of interest and liquidated damages. Further, in the event the Company fails to timely make any payments described in this Note, All amounts described in paragraph 1 herein shall immediately become due on the 10th day following the date on which payment should have been received by the Fund's under the terms of this Note. In such event the Company further agrees to pay all attorney fees and costs incurred by the Funds in any action to enforce any part or all of this Note.

9. This Installment Note is conditioned on the Company's staying current on its obligations to the Funds under the terms of the collective bargaining agreement and the Funds' respective Agreements and Declarations of Trust. In the event that the Company fails to maintain its obligations under the terms of the collective bargaining agreement and the Funds' respective Agreements and Declarations of Trust, including, but no limited to, its obligations to submit timely contribution reports and to make timely contribution payments by the tenth day following the month in which laborers' work was performed, then the Funds shall have the right to accelerate and collect all amounts due under this Installment Note, plus payment of all attorneys' fees and costs incurred by the Funds in any action to accelerate this Installment Note.

10. The Company further agrees to obtain and maintain a surety bond to insure the payment of wages and benefit contributions as required under the terms of the CBA.

11. The Company shall have the right to prepay the entire amount due under the Note prior to the date upon which payment is due without penalty and without payment of any precalculated Note interest that has not accrued as of the date full payment has been made.

The Parties hereby agree to these terms by their execution hereof on the __31st__ day of the __August__, 2012.

Jacobs & Son, Inc.

By: _____ Kenneth Jacobs

Title: Owner

Laborers' Pension Fund

By: _____

Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity.

By: _____

# GUARANTY OF PAYMENT AND INDEMNIFICATION

This Guaranty ("Guaranty") is made as of _____ August 29th, 2012 _____ by the undersigned, _____ Kenneth Jacobs _____, (the "Guarantor"), to and for the benefit of the LABORERS' PENSION FUND AND THE LABORERS' WELFARE FUND OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY (the "District Council") and any related ancillary Funds to which Jacobs & Son, Inc. is obligated to pay contributions to by virtue of its Agreement with the District Council and the Funds' respective Agreements and Declarations of Trust (collectively the "Funds").

WHEREAS, Jacobs & Son, Inc. (the "Company") has agreed to pay a total of $165,726.31 to the Funds in settlement of the alleged delinquent contributions owed to the Funds and to be paid under the terms of a Settlement Agreement and Installment Note ("Note").

WHEREAS, the Funds are unwilling to enter into the Note unless the Guarantor executes this Guaranty; and

WHEREAS, the Guarantor has a financial interest in the Company and will be benefited by the Note:

NOW THEREFOREWHEREAS, in consideration of the foregoing, the Guarantor agrees as follows:

1. Guaranty of Payment and Indemnification. The undersigned guarantees, absolutely and unconditionally: (a) the payment when due of the entire principal indebtedness and all interest evidenced by the Note during the twenty-four (24) month payment period including interest and liquidated damages for late or unpaid payments due on the Note; and (b) the full and complete payment of any and all fees and costs incurred pursuant to default under terms of the Note, whether litigation is involved or not, and if involved, whether at the trial or appellate levels or in pre- or post-judgment bankruptcy proceedings in enforcing or realizing upon the obligations of the Guarantor hereunder (the obligations of Guarantor under this Paragraph 1 are collectively hereinafter referred to as the "Obligations"). The Guarantor also agrees to be personally liable for all monthly benefit contributions, union dues and/or wages owed from the Company to the Funds, the District Council, all ancillary funds, and/or the participants that are due at the time the Note and Guaranty are entered into and/or are incurred and become due and owing for the duration of the Note, including all interest, liquidated damages, audit costs, attorneys' fees and costs.

2. Continuing Guaranty. This Guaranty shall be a continuing Guaranty, and shall not be discharged, impaired or affected by; (a) the existence or continuance of any obligation on the part of the Company with respect to the Note; (b) any forbearance or extension of the time of payment of the Note; (c) the validity or invalidity of the Note; (d) any defenses whatsoever that the Company or any of the party thereto may have to the performance or observance of any term, covenant or condition contained in the Note; (e) the existence or non-existence of the Company as a legal entity; (f) any limitation or exculpation of (other than the payment and performance in full of all of the Company's Obligations) that Guarantor may have as to his undertakings, liabilities and obligations hereunder, including any defenses based upon any legal disability of the Company or any discharge or limitation of the disability of the Company, whether consensual or arising by operation of law or any bankruptcy, insolvency or debtor-relief proceeding, or from any other cause, each and every such defense being hereby waived by the Guarantor.

3. Waivers. Guarantor waives diligence, presentment, protest, notice of dishonor, demand for payment, extension of time of payment, notice of acceptance of this Guaranty, non-payment at maturity and indulgences and notices of every kind not provided for under this Guaranty. It is the intention of this Guaranty that Guarantor shall remain liable as principal, notwithstanding any act, omission or thing that might otherwise operate as a legal or equitable discharge of Guarantor, until all of the Company's obligations shall have been fully paid and performed.

4. Subrogation. Notwithstanding anything to the contrary elsewhere contained herein or in the Note, the Guarantor(s) expressly waive with respect to the Company any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to set off or to any other rights that could accrue to a surety against a

1


EXHIBIT
B

principal, to the Guarantor against a maker or obligor, to an accommodation party against the party accommodated, or to a holder or transferee against a maker, and which the guarantor may have or hereafter acquire against the Company in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guaranty or the Note. The Guarantor agrees that he or she shall not have or assert any such rights against the Company or its successors and assigns or any other party (including any surety), either directly or as an attempted set off to any action commenced against the Guarantor by the Company (as borrower or in any other capacity) or any other person.

5. Independent Obligations. The Funds may enforce this Guaranty without first resorting to or without first having recourse to the Note; provided, however, that nothing herein contained shall preclude the Funds from suing on the Note or from exercising any other rights; and the Funds shall note be required to institute or prosecute proceedings to recover any deficiency as a condition of any payment hereunder or enforcement hereof.

6. Acceleration. In the event that payments due under the Note shall be accelerated, the Guarantor's obligations hereunder shall also be accelerated without further notice from the Funds.

7. Effect of Bankruptcy. This Guaranty shall continue in full force and effect notwithstanding the institution by or against the Company of bankruptcy, reorganization, readjustment, receivership or insolvency proceedings of any nature, or the disaffirmance of the Note in any such proceedings, or others.

8. Termination. This Guaranty shall remain in full force and effect as to the Guarantor until all of the Companys' Obligations under the Note outstanding shall be finally and irrevocably paid in full. Payment of all of the Company's Obligations from time to time shall not operate as a discontinuance of this Guaranty. If after receipt of any payment of all or any part of the Company's Obligations, the Funds are for any reason compelled to surrender such payment to any person or entity, because such payment is determined to be void or voidable as a preference, impermissible set off, or a diversion of trust fund, or for any reason, this Guaranty shall continue in full force notwithstanding any contract action which may have been taken by the Funds in reliance upon such payment, and any such contrary action so taken shall be without prejudice to the Funds' rights under this Guaranty and shall be deemed to have been conditioned upon such payment having become final and irrevocable.

9. The Company's Financial Condition. The Guarantor assumes full responsibility for keeping fully informed of the Company's financial condition and all other circumstances affecting the Company's ability to perform its Obligations, and agree that the Funds will have no duty to report to Guarantor any information which the Funds receive about the Company's financial condition or any circumstances bearing on its ability to perform.

10. Expenses. The undersigned agrees to pay and reimburse the Funds for all cost and attorney's fees, which they may expend or incur in the enforcement of this Guaranty or any of the Company's Obligations under the Note.

11. Delay, Cumulative Remedies. No delay or failure by the Funds to exercise any right to remedy against the Company or Guarantor will be construed as a waiver of that right or remedy. All remedies of the Funds against the Company and the Guarantor are cumulative.

12. Binding Effect. This guaranty shall incur to the benefit of and may be enforced by the Funds, and shall be binding upon and enforceable against the Guarantor and Guarantor's heirs, legal representatives, successors and assigns. In the event of the death of the Guarantor, the obligations of such deceased Guarantor shall continue in full force and effect against his estate, personal representatives, successors and assigns. Without limiting the generality of the foregoing, the Funds (or their successors and assigns) may from time to time and without notice to undersigned, assign any and all of their rights under this Guaranty without in any way affecting or diminishing the obligations of the undersigned hereunder, who shall continue to remain bound by the obligated to perform under and with respect to this Guaranty as though there had been no such assignment.

13. Default. The Guarantor hereby authorizes irrevocably any attorney of any court of record to appear for him/her in such court, at any time after ten (10) days notice after default in any payment due under this Guaranty, and confess judgement against Guarantor, after service of notice of the claimed default, in favor of the Funds for such

amount to be unpaid and owed thereon, including interest, liquidated damages and reasonable cost of collection including reasonable attorneys' fees. The Guarantor agrees to waive and release all errors which may intervene in any such proceedings, and consent to immediate execution upon such judgement, hereby ratify and confirming all that said attorney may do by virtue hereof.

14. **Warranties.** Guarantor makes to the Funds the following representations and warranties:

(a) **Authorization.** Guarantor has full right, power and authorization to enter into this Guaranty and carry out his obligations hereunder

(b) **No Conflict.** The execution, delivery and performance by Guarantor of this Guaranty will not violate or be in conflict with, results in a breach of, or constitute a default under, any indenture, agreement or any other instrument to which Guarantor is a party or by which Guarantor or any of his assets or properties is bound, or any order, writ, injunction or decree of any court or governmental institute.

(c) **Litigation.** There are no actions, suits or proceedings pending, or to the knowledge of Guarantor, threatened against or adversely affecting any Guarantor at law of in equity or before or by governmental agency or instrumentality that involve any of the transactions herein contemplated, or the possibility of any judgment or liability that may result in any material and adverse change in the financial condition of any Guarantor. Guarantor is not in default with respect to any judgment, order, writ, injunction, decree, rule or regulation of any court.

(d) **Enforceability.** This guaranty is a legal, valid and binding obligation of Guarantor, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

15. **Notices.** All notices or other communications required or permitted hereunder shall be (a) in writing and shall be deemed to be given when either (I) delivered in person, (II) three (3) days after deposit in a regularly maintained receptacle of the United States mail as registered or Certified mail, postage prepaid, (III) when received if sent by private courier service, or (IV) on the day on which Guarantor refuses delivery by mail or by private courier service, and (b) addressed as follows:

In Case of Guarantor

Kenneth Jacobs
3901 Industrial Avenue
Rolling Meadows, IL 60008

In Case of the Funds:

Collection Counsel
Patrick T. Wallace
Laborers Pension & Welfare Fund
Sub Office
111 W Jackson Blvd
Suite 1415
Chicago IL 60604-3868

or such other addresses as may from time to time be designated by the party to be addressed by notice to the other in the manner hereinabove provided. The Funds will use their best efforts to send courtesy copies of notices provided hereunder to Guarantor's attorney, _____. But the failure by the Funds to send courtesy copies to Guarantor's attorney shall not limit or restrict the Funds' rights under this Guaranty in any manner nor relieve Guarantor of any obligations under this guaranty.

16. **Additional Waivers.** Guarantor expressly and unconditionally waives, in connection with any suit, action or proceeding brought by the Funds on this Guaranty, any and every right he or she may have to (I) injunctive relief, (II) a trial by jury, (III) interpose any counterclaim therein and (IV) seek to have the same consolidated with any other or separate suit, action or proceeding.

3

17. **Severability.** If all or any portion of any provision of this Guaranty is declared or found by a court of competent jurisdiction to be unenforceable or null and void, such provision or portion thereof shall be deemed stricken and severed from this Guaranty and the remaining provisions and portions hereof shall continue in full force and effect.

18. **Applicable Law; Venue.** This Guaranty and the transactions evidenced hereby shall be construed and interpreted under the laws of the State of Illinois. Guarantor, in order to induce the Funds to accept this Guaranty and inter into the loan agreement, and for other good and valuable consideration, the receipt and sufficiency of which hereby is acknowledged, agrees that all actions or proceedings arising directly, indirectly or otherwise in connection with, out of, related to or from this Guaranty shall be litigated, at the Fund's sole discretion and election, only in courts having a situs within the county of Cook, State of Illinois, Eastern Division. Guarantor hereby waives any right he or she may have to transfer or change the venue of any litigation brought against him by the Funds on this agreement in accordance with this paragraph.

19. **Time is of the Essence.** Time is of the essence of this Guaranty as to the performance of the undersigned.

20. **Death of a Guarantor.** In the event of the death of Guarantor, the Funds shall have the right to accelerate the indebtedness evidenced by the Note unless, within sixty (60) days of his death, Guarantor's estate assumes his obligations hereunder by an instrument satisfactory to the Funds and delivers to the Funds security for performance of such obligations satisfactory to the Funds.

IN WITNESS WHEREOF, the three undersigned Guarantors has executed this instrument as of the date and year first above written.

Kenneth Jacobs   3901 Industrial Avenue  Rolling Meadows, IL 60008

_____

Kenneth Jacobs

Social Security Number

Date: August 29th, 2012

APPROVED AS TO FORM AND SUBSTANCE
ON BEHALF OF GUARANTOR;

Dated: _____

✦ This agreement is being executed subject to the following:
   1) Jacobs & Son / Kenneth Jacobs  bank always takes First position.
   2) The personal agreement is limited to the 24 month duration of the note.
   3) Jacobs & Son / Kenneth Jacobs has the right to pay off all monies due in advance without penalty.
   4) In the event Jacobs & Son / Kenneth Jacobs pays all monies due in advance of the 24 month period,
      this note/guaranty will terminate.

4

# COMMERCIAL SECURITY AGREEMENT

DEBTORS:    Jacobs & Son, Inc. (FEIN# - _____ _____ )
c/o Kenneth Jacobs, Registered Agent
3901 Industrial Ave.
Rolling Meadows, IL 60008

Kenneth M. Jacobs
1140 Derbyshire
Arlington Heights, IL 60004

CREDITOR:    James S. Jorgensen, Administrator
Laborers' Pension and Welfare Funds
11465 W. Cermak Road
Westchester, IL 60154

THIS COMMERCIAL SECURITY AGREEMENT is entered into between Jacobs & Son, Inc. and Kenneth M. Jacobs (collectively referred to below as "Grantor"); and James S. Jorgensen, Administrator of the Laborers' Pension Fund and Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, and agent of the General Laborers' District Council of Chicago and Vicinity Training Fund (collectively referred to below as "Creditor"). For valuable consideration, Grantor grants to Creditor a security interest in the amount of $165,726.31 in the Collateral to secure the indebtedness and agrees that Creditor shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Creditor may have by law.

DEFINITIONS. The following words shall have the following meanings when used in this Agreement. Terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. All references to dollar amounts shall mean amounts in lawful money of the United States of America.

    Agreement. The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

    Collateral. The word "Collateral" means the following described property of Grantor, whether now owned or hereafter acquired, whether now exiting or hereafter arising, and wherever located:

    (a)    All attachments, accessions, accessories, tools, parts, supplies, increases, and additions to and all replacements of and substitutions for any property described above.

    (b)    All products and produce of any of the property described in this Collateral section.

    (c)    All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, airing out of a sale, lease, or other disposition of any of the property described in this Collateral section.

    (d)    All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section.

    (e)    All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

    (f)    All inventory, material, equipment, deposit accounts, consumer goods, investment property, and accounts receivable.



Creditor. The word "Creditor" means James S. Jorgensen, Administrator of the Laborers' Pension Fund and Laborers' Welfare Fund for the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, and agent of the General Laborers' District Council of Chicago and Vicinity Training Fund, his successors and assigns.

Event of Default. The words "Event of Default" mean and include without limitation any of the Events of Default set forth below in the section titled "Events of Default."

Grantor. The word "Grantor" means Jacobs & Son, Inc., its successors and assigns, and Kenneth M. Jacobs, individually.

Guarantor. The word "Guarantor" means and includes without limitation each and all of the guarantors, sureties, and accommodation parties in connection with the indebtedness.

Indebtedness. The word "Indebtedness" means the indebtedness evidenced by the Installment Note, including all principal and interest, together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. In additional the word "Indebtedness" includes all other obligations, debts and liabilities, plus interest thereon, of Grantor, or any one or more of them, to Creditor, as well as all claims by Creditor against Grantor, or any one or more of them, whether existing now or later; whether they are voluntary or involuntary, due or not due, direct or indirect, absolute or contingent, liquidated or unliquidated; whether Grantor may be liable individually or jointly with others; whether Grantor may be obligated as guarantor, surety, accommodation party or otherwise; whether recovery upon such indebtedness may be or hereafter may become barred by any statute of limitations; and whether such indebtedness may be hereafter may become other unenforceable.

Note. The word "Installment Note" means the Installment Note and Guaranty of Payment and Indemnification Agreement entered into by Jacobs & Son, Inc. and Kenneth M. Jacobs with the Creditor on or about **September 07, 2012**

Related Documents. The words "Related Documents" mean and include without limitation all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

OBLIGATIONS OF GRANTOR. Grantor warrants and covenants to Creditor as follows:

   **Perfection of Security Interest.** Grantor agrees to execute such financing statements and to take whatever other actions are requested by Creditor to perfect and continued Creditor's security interest in the Collateral. Upon request of the Creditor, Grantor will deliver to Creditor any and all of the documents evidencing or constituting the Collateral, and Grantor will note Creditor's interest upon any and all chattel paper if not delivered to Creditor for possession by Creditor. Grantor hereby appoints Creditor as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue the security interest granted in this Agreement. Creditor may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Creditor for all expenses for the perfection and the continuation of the perfection of Creditor's security interest in the collateral. Grantor promptly will notify Creditor before any change in Grantor's name including any change to the assumed business names of Grantor. **This is a continuing Security Agreement and will continue in effect even though all or any part of the indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Creditor.**

   **No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

2

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, the Collateral is enforceable in accordance with its terms, is genuine, and complies with applicable laws concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority, and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Creditor, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held submit to delivery instruction or theretofore shipped or delivered pursuant to a contract of sale, or for services theretofore performed by Grantor with or for the account debtor; there shall be no setoffs or counterclaims against any such account, and no agreement under which any deductions or discounts may be claimed shall have been made with the account debtor except those disclosed to Creditor in writing.

**Location of the Collateral.** Grantor, upon request of Creditor, will deliver to Creditor, in form satisfactory to Creditor a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (a) all real property owned or being purchased by Grantor; (b) all real property being rented or leased by Grantor; (c) all storage facilities owned, rented, leased, or being used by Grantor; and (d) all other properties where Collateral is or may be located. Except in the ordinary course of its business, Grantor shall not remove the Collateral from its existing locations without the prior written consent of the Lender.

**Removal of Collateral.** Grantor shall keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts, the records concerning the Collateral) at Grantor's address shown above, or at such other locations as are acceptable to Creditor. Except in the ordinary course of its business, including the sales of inventory, Grantor shall not remove the Collateral from its existing locations without the prior written consent of Creditor. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicle outside the State of Illinois, without the prior written consent of Creditor.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, Grantor shall not sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be submit to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this agreement, without the prior written consent of Creditor. This includes security interest even if junior in right to the security interest granted under this Agreement. Unless waived by Creditor, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Creditor and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Creditor to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Creditor.

**Title.** Grantor represents and warrants to Creditor that it holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Creditor has specifically consented. Grantor shall defend Creditor's rights in the Collateral against the claims and demands of all other persons.

**Collateral Schedules and Locations.** As often as Creditor shall require, and insofar as the Collateral consists of accounts, Grantor shall deliver to Creditor schedules of such Collateral, including such information as Creditor may require, including without limitation names and addresses of such account debtors and agings of accounts. Insofar as the Collateral consists of inventory and equipment, Grantor shall deliver to Creditor, as often as Creditor shall require, such lists descriptions, and designations of such Collateral as Creditor may require to identify the nature, extent, and location of such Collateral. Such information shall be submitted for Grantor and each of its subsidiaries or related companies.

**Maintenance and Inspection of Collateral.** Grantor shall maintain all tangible Collateral in good condition and repair. Grantor will not commit or permit damage to or destruction of the Collateral or any part of the Collateral. Creditor and its designated representatives and agents shall have the right at all reasonable times to examine, inspect, and audit the Collateral wherever located. Grantor shall immediately notify Creditor, of all cases involving the return, rejection, repossession, loss or damage of or to any Collateral; of any request for credit or adjustment or of any other dispute arising with respect to the Collateral; and generally of all happenings and events affecting the Collateral or the value or the amount of the Collateral.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the indebtedness, or upon any of the other Related documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligations to pay and so long as Lender's interest in the Collateral is not jeopardized in Creditor's sole opinion. If the Collateral is subject to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Creditor cash, a sufficient corporate surety bond or other security satisfactory to Creditor in any amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Creditor and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Creditor as an additional obligee under any surety bond furnished in the contest proceedings.

**Compliance with Governmental Regulations.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable tot he ownership, production, disposition, or use of the Collateral. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceedings, including appropriate appeals, so long as Creditor's interest in the Collateral, in Creditor's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any hazardous waste or substance, as those terms are defined in the Comprehensive Environmental Response, Compensation, and Liability At of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No., 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. The terms "hazardous waste" and "hazardous" substance" shall also include, without limitation, petroleum and petroleum by-products or any fractions thereof and asbestos. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for hazardous wastes and substances. Grantor hereby (a) releases and waives any future claims against Creditor for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify shall survive the payment of indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Creditor and issued by a company or companies reasonably acceptable to Creditor. Grantor, upon request of Creditor, will deliver to Creditor from time to time the policies or certificates of insurance in form satisfactory to Creditor, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Creditor and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Creditor will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Creditor holds or is

offered a security interest, Grantor will provided Creditor with such loss payable or other endorsements as Creditor may require. If Grantor at any time fails to obtain or maintain any insurance as required under the Agreement, Creditor may (but shall not be obligated to) obtain such insurance as Creditor deems appropriate, including if it so chooses "single interest insurance," which will cover only Creditor's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Creditor of any loss or damage to the Collateral. Creditor may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall beheld by Creditor as part of the Collateral. If Creditor consents to repair or replacement of the damage or destroyed Collateral, Creditor shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Creditor does not consent to repair or replacement of the Collateral, Creditor shall return a sufficient amount of the proceeds to pay all of the indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the indebtedness.

**Insurance Reserves.** Creditor may require Grantor to maintain with Creditor reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Creditor to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Creditor. The reserve funds shall be hold by Creditor as a general deposit and shall constitute a non-interest-bearing-account which Creditor may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Creditor does not hold the reserve funds in trust for Grantor, and Creditor is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Creditor, shall furnish to Creditor reports on each existing policy of insurance showing such information as Creditor may reasonably request including the following: (a) the name of the insurer; (b) the risks insured; (c) the amount of the policy; (d) the property insured; (e) the then current value on the basis of which insurance has been obtained and manner of determining that value; and (f) the expiration date of the policy. In addition, Grantor shall upon request by Creditor have an independent appraiser satisfactory to Creditor determine, as applicable, the cash value or replacement cost of the Collateral.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default on the Installment Note and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Creditor is required by law to perfect Creditor's security interest in such Collateral. Until otherwise notified by Creditor, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Creditor may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Creditor for application to the Indebtedness. If Creditor at any time has possession of any Collateral, whether before or after an Event of Default, Creditor shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Creditor takes such action for that purposes as Grantor shall request or as Creditor, in Creditor's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Creditor shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, not to protect, preserve or maintain any security interest given to secure the indebtedness.

**EXPENDITURES BY CREDITOR.** If not discharged or paid when due, Creditor may (but shall not obligated to) discharge or pay any amounts required to be discharged or paid by Grantor under this Agreement, including without limitation all taxes, liens, security interest, encumbrances, and other claims, at any time levied or placed on the Collateral. Creditor also may (but shall not be obligated to) pay all costs for insuring, maintaining and preserving

the Collateral. All such expenditures incurred or paid by Creditor for such purposes will then bear interest at the rate charged under the Installment Note from the date incurred or paid by Creditor to the date of repayment by Grantor. All such expenses shall become a part of the indebtedness and, at Creditor's option, will (a) be payable on demand, (b) be added to the balance of the Installment Note and be apportioned amount and be payable with any installment payments to become due during either (i) the term of any applicable insurance policy or (ii) the remaining term of the Installment Note, or (c) treated as a balloon payment which will be due and payable at the Installment Note's maturity. This Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Creditor may be entitled upon the occurrence of an Event of Default.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Grantor, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Creditor is forced to remit the amount of that payment (a) to Grantor's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (b) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Creditor or any of creditor's property, or (c) by reason of any settlement or compromise of any claim made by Creditor with any claims (including without limitation Grantor), the Indebtedness shall be considered unpaid for the purposes of enforcement of this Agreement and this Agreement shall continue to be effective of shall be reinstated, as the case may be, notwithstanding any cancellation of this Agreement or, of any note or other instrument or agreement evidencing the Indebtedness and the Collateral will continue to secure the amount repaid or recovered to same extent as if that amount never had been originally received by Creditor, and Grantor shall be bound by any judgment, decree, order settlement or compromise relating to the Indebtedness or to this Agreement.

**EVENTS OF DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

> **Default in Indebtedness.** Failure to Grantor to make any payment when due on the Installment Note.

> **Other Defaults.** Failure of Grantor to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents in any other agreement between Creditor and Grantor.

> **Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrowers' or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

> **False Statements.** Any warranty, representation or statement made or furnished to Creditor by or on behalf of Grantor under this Agreement, the Note or the Related documents is false or misleading in any material respect, either now or at the time made or furnished.

> **Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral documents to create a valid and perfected security interest or lien) at any time and for any reason.

> **Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

> **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor by any governmental agency against the Collateral or any other collateral securing the indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Creditor. however, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or

forfeiture proceedings, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or such Guarantor dies or becomes incompetent. Creditor, at its option, may but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Creditor and, in doing so, cure the Event of Default.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Creditor believes the prospect of payment or performance of the indebtedness is impaired.

**Insecurity.** Lender, in good faith, deems itself insecure.

**Right to Cure.** If any default, other than a Default in Indebtedness, is curable and if Grantor has not been given a prior notice of a breach of the same provision of this Agreement, it may be cured (and no Event of Default will have occurred,) if Grantor, after Creditor sends written notice demanding cure of such default, (a) cures the default within five (5) days, or (b) if the cure requires more than five (5) days, immediately initiates steps which Creditor's deems in Creditor's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event or Default occurs under this Agreement, at any time thereafter, Creditor shall have all the rights of a secured party under the Illinois Uniform Commercial Code. In addition and without limitation, Creditor may exercise any one or more of the following rights and remedies.

**Accelerate Indebtedness.** Creditor may declare the entire indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice.

**Assemble Collateral.** Creditor may require Grantor to deliver to Creditor all or any portion of the Collateral and any and all certificates of title and other documents related to the Collateral. Creditor may require Grantor to assemble the Collateral and make it available to Creditor at a place to be designated by Creditor. Creditor also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agreed Creditor may take such other goods, provided the Creditor makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Creditor shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in its own name or that of grantor. Creditor may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily cold on a recognized market, Creditor will give Grantor reasonable notice of the time after which any private sale or any other intended disposition of the Collateral is to be made. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** To the extent permitted by applicable law, Creditor shall have the following rights and remedies regarding the appointment of a receiver; (a) Creditor may have a receiver appointed as a matter of right, (b) the receiver may be an employee of Creditor and may serve without bond, and (c) all fees of the receiver or his or her attorney shall become part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from the date of expenditure until repaid.

**Collect Revenues, Apply Accounts.** Creditor, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Creditor may at any time in its discretion transfer any Collateral into it own name or that of its nominee and receive the payments, rents, income, and

revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Creditor may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Creditor may demand, collect, receipt for, settle, compromise, adjust, sue for foreclose, or realize on the Collateral as Creditor may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Creditor may, on behalf of an in the name of Grantor, receive, open and dispose of mail addressed to Grantor, change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Creditor may notify accounts debtor and obligors on any Collateral to make payments directly to Creditor.

**Obtain Deficiency.** If Creditor chooses to sell any or all of the Collateral, Creditor may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Creditor after application or all amounts received from the exercise of the rights provided in this Agreement, Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Creditor shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Creditor shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Cumulative Remedies.** All of Creditor's rights and remedies, whether evidenced by this Agreement or the Related Documents or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Creditor to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligations of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Creditor right to declare a default and to exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provides are a part of this Agreement.

**Amendments.** This Agreement, together with the Note, Guaranty of Payment and Indemnification and any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Applicable Law.** This Agreement has been delivered to Creditor and accepted by Creditor in the State of Illinois. If there is a lawsuit, Grantor agrees upon Creditor's request to submit to the jurisdiction of the courts of the State of Illinois. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

**Attorneys' Fees, Expenses.** Grantor agrees to pay on demand all of the Creditor's costs and expenses, including attorneys' fees and Creditor's legal expenses, incurred in connection with the enforcement of this Agreement. Creditor may pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses included Creditor's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (and including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not be used to interpret or define the provisions of this Agreement.

**Multiple Parties; Corporate Authority.** All obligations of Grantor under this Agreement shall be joint and several, and all references to Grantor shall mean each and every Grantor. This means that each of the persons signing below is responsible for all obligations in this Agreement.

**Notices.** All notices required to be given under this Agreement shall be given in writing, may be sent by telefacsimile (unless otherwise required by law), and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to given at the address show above. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. To the extent permitted by applicable law, if there is more than one Grantor, notice to any Grantor will constitute notice to all Grantors. For notice purposes, Grantor will keep Creditor informed at all times of Grantor's current address(es).

**Power of Attorney.** Grantor hereby appoints Creditor as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to do the following: (a) to demand, collect, receive, receipt for, sue and recover all sum of money or other property which may now or hereafter become due, owing or payable from the Collateral; (b) to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment for the Collateral; (c) to settle or compromise any and all claims arising under the Collateral; and, if the place and stead of Grantor, to execute and deliver its release and settlement for the claim; and (d) to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of Grantor, or otherwise, which in the discretion of Creditor may seem to be necessary or advisable. This power is given as security for indebtedness, and the authority hereby conferred is and shall be irrevocable and shall remain in full force and effect until renounced by Creditor.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstances, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

**Successor Interests.** Subject to the limitations set forth above on transfer of the Collateral, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waiver.** Creditor shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Creditor. No delay or omission on the part of Creditor in exercising any right shall operate as a waiver of such right or any other right. A waiver by Creditor of a provision of this Agreement shall not prejudice or constitute a waiver of Creditor's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Creditor, nor any course of dealing between Creditor and Grantor, shall constitute a waiver of any of Creditor's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Creditor is required under the Agreement, the granting of such consent by Creditor in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all case such consent may be granted or withheld in the sole discretion of Creditor.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT, AND GRANTOR AGREES TO ITS TERMS. THIS AGREEMENT IS DATED September 07, 2012

GRANTOR:
Jacobs & Son, Inc.

By: _____
Kenneth M. Jacobs, Officer and Shareholder

GRANTOR:
Kenneth M. Jacobs, Individually

By: _____
        Kenneth M. Jacobs

CREDITOR:
James S. Jorgensen, Administrator of the Laborers' Pension Fund and Laborers' Welfare Fund for the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, and agent of the General Laborers' District Council of Chicago and Vicinity Training Fund.

By: _____
        James S. Jorgensen, Administrator

# CONTRACT FOR CASH BOND

This agreement is entered into by The Laborers Pension Fund, the Health and Welfare Department of the Construction and General Laborers District Council of Chicago and Vicinity (the "Funds") and the following contributing employer to the Funds:

Kenneth Jacobs / Jacobs & Son
(Full Name)

3901 Industrial Avenue
(Address)

Rolling Meadows, IL 60008
(City, State, Zip Code)

WHEREAS Article VII, Section 2 and Article VI, Section 2 of the agreements and declarations of trust establishing the aforementioned Pension Fund and Health and Welfare Fund to authorize the Funds to accept cash bonds as guarantees for the payment of monthly contributions to the Funds; and

WHEREAS contributing employers under the terms of the applicable collective bargaining agreement are required to post surety bonds or cash bonds in a form acceptable to the Construction and General Laborers District Council of Chicago and Vicinity (the "Union");

WHEREAS the Union has agreed to the establishment by the Funds of a bank account or money-market account or other account for the holding of cash bonds pursuant to contractors approved by the Boards of Trustees of the Funds; and

WHEREAS the Boards of Trustees of the Funds have approved the establishment by the Funds of a bank account or money-market account or other account for the holding of cash bonds by contributing employers;

NOW therefore, the parties hereby agree that:



A.   Procedures For Filing a Cash Bond and Use of the Bond.

The Employer named above shall pay the amount listed below to the Funds as a cash bond to guarantee payment of employee wages, pension and welfare contributions owed to the Employer to employees of the Employer and/or to the Funds for work performed by the employees under the terms of a collective bargaining agreement between the Employer and the Construction and General Laborers District Council of Chicago and Vicinity;

The cash bond shall be used to satisfy on a pro rata basis amounts due for unpaid wages and/or unpaid contributions to the Funds, including liquidated damages and interest owed to the Funds; and

The Administrator of the Funds is authorized to deposit the cash payment listed below in an interest-bearing account, money-market account or other account for deposit of such funds to be selected at the discretion of the Administrator, to retain the interest earned on a said cash deposit to defray the expenses of the Funds for the administration of cash bonds and for the collection of delinquencies; and

To deduct from said account and pay to employees and/or to the Funds any amounts determined by the Administrator, based upon reasonably reliable information provided by representatives of the Union, the Field Representatives of the Funds or compliance auditors of the Funds or Union, the full amount of any unpaid wages or unpaid contributions, liquidated damages or interest.

The Administrator shall provide written notice at least ten (10) days in advance to the Employer of a determination by the Administrator to deduct sums from the cash bond to satisfy the claims for wages and/or unpaid contributions, liquidated damages or interest.

2

The Employer, within ten (10) days of the date of the notice sent by the Administrator, may make other arrangements to pay the wages and/or contributions determined to be owed by the Administrator and shall provide written evidence to the Administrator of such arrangements.

An objection by the Employer that the claimed wages and/or contributions are not due and owing shall not prevent the Administrator from directing the payment of claimed wages and/or contributions. If a determination is made at a later date that the wages paid to employees or the contributions, liquidated damages or interest paid to the Funds was not due and owing, the sole liability of the Funds shall be to restore the cash bond of any Employer to the extent of the contributions, liquidated damages and interest paid as contributions on behalf of the Employer that should not have been paid. Any claim of the Employer for wages improperly paid to employees shall be made against the employees who received the payments and not against the Funds or Administrator as long as the Administrator based the payments on information received from a source that the Administrator considered to be reasonably reliable. An auditor's report or employee affidavits shall be conclusive proof of such a reasonably reliable source.

B.    Procedures for Requesting a Refund of a Cash Bond

The Employer may request and obtain a refund of any balance of the cash bond being held by the Funds if the Employer ceases to do business for which contributions would be owed to the Funds under the terms of a collective bargaining agreement with the Union or during any period in which the Employer would be required to maintain existing terms and conditions of employment while negotiating over the terms to be included in a new collective bargaining agreement. The refund will be provided upon completion of an audit which verifies that there are no outstanding contributions, interest, liquidated damages and/or audit costs revealed as due and owing for the period of time under which the Funds have held the Cash Bond. The Cash

3

Bond may be refunded prior to the completion of any audit if the shareholders of the Company personally guarantee any indebtedness that may be revealed pursuant to an audit of the Company's books and records for the time period during which the Funds held the Cash Bond.

An Employer may obtain a refund of the cash bond if the Employer provides a surety bond written by an insurance carrier with reserves in excess of $1,000,000 authorized, licensed, or permitted to do business in the state of Illinois; provided that the amount of said surety bond is in compliance with the terms of the Employer's collective bargaining agreement with the Union or any amount previously prescribed by the Trustees for a delinquent employer equal to three times the monthly contributions of such Employer, as estimated by the Trustees, in accordance with the terms of the agreements and declarations of trust of the Funds.

No cash refund shall be paid to the Employer until the Employer has provided the necessary surety bond or evidence satisfactory to the Administrator that the employer has ceased doing business that would require contributions to the Funds. If the Employer fails to provide a refund request along with the necessary supporting information within three years of the date on which the Employer last contributed to the Funds, the Employer shall forfeit its right to a refund and the Administrator shall transfer any balance credited to the Employer to the general accounts of the Funds to defray the costs of employer delinquencies.

C.    Amount of Cash Bond

This agreement for the payment and deposit of a cash bond in the amount of $5,000.00 to be paid out in twenty (20) monthly payments in the amount of $250.00 each, commencing on December 1, 2012 is entered into this _____14th_____ day of _____November_____, 2012, by the undersigned representatives of the Employer and Funds:

For the Employer:

Jacobs & Son  Kennth Jacobs

Position:  Owner

Date:  November 14, 2012

For the Funds:

Administrator

Date: 11/28/12

## CERTIFICATE OF SERVICE

The undersigned certifies that he caused a copy of the foregoing Settlement Agreement and Stipulation to be served upon the following persons via the Court's electronic notification system this 26th day of November 2012.

Todd A. Miller
Kathleen M. Cahill
Allocco, Miller & Cahill, P.C.
3409 North Paulina Street
Chicago, IL 60657

/s/ Patrick T. Wallace

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LABORERS' PENSION FUND and )
LABORERS' WELFARE FUND OF THE )
HEALTH AND WELFARE DEPARTMENT )
OF THE CONSTRUCTION AND GENERAL )
LABORERS' DISTRICT COUNCIL OF )
CHICAGO AND VICINITY, and JAMES S. )
JORGENSEN, Administrator of the Funds, )
                                      )
              Plaintiffs,             )     Case No. 12 C 2514
                                      )
     v.                               )
                                      )     Judge Zagel
JACOBS & SON, INC., an Illinois corporation, )
and KENNETH M. JACOBS, individually,  )
                                      )
              Defendants.             )

## DECLARATION OF PATRICK T. WALLACE

I, PATRICK T. WALLACE, declare and state as follows:

1.      I am Fund Counsel for Plaintiffs Laborers' Pension Fund and Laborers' Welfare

Fund of the Health and Welfare Department of the Construction and General Laborers' District

Council of Chicago and Vicinity (the "Laborers' Funds"), Plaintiffs in the above-referenced

action. This Declaration is submitted in support of the Laborers' Funds' Motion for Entry of

Default Judgment in Sum Certain.

2.      Shareholders of the law firms of Allison, Slutsky & Kennedy, out-of-house

collection counsel for the Laborers' Funds, bill the Laborers' Funds at a rate of $225.00 per hour

for shareholders, $195.00 per hour for associates, and $110.00 per hour for paralegals. Affiant,

as in-house counsel for the Laborers' Funds, has first-hand knowledge that the foregoing hourly

rates have been found reasonable and have been awarded by many courts in collection

proceedings.



EXHIBIT
C

3.　　I received a Bachelor of Arts Degree from the University of Illinois at Urbana-Champaign in 1992 and a Juris Doctor Degree from the University of DePaul College of Law in 1995. I was admitted to the bar of the State of Illinois in November 1995 and to the bar of the United States District Court for the Northern District of Illinois in December 1995. I have also been admitted to the bar of the United States District Court for the Central District of Illinois. I was admitted to the Trial Bar of the Northern District of Illinois on September 20, 2000. From November 1995 to August 2000 I practiced labor and employment law as an associate at the law firm of Katz, Friedman, Eagle, Eisenstein & Johnson (formerly Katz, Friedman, Schur & Eagle). In September 2000, I became Fund Counsel for the Laborers' Pension Fund and Laborers' Welfare Fund for the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity.

4.　　Based on the foregoing, $225.00 represents a fair and reasonable market rate for my in-house legal services to the Funds in this matter.

5.　　Jerrod Olszewski, in-house counsel for the Laborers' Funds, received a Bachelor of Arts Degree from Benedictine University in 1993 and a Juris Doctor Degree from the John Marshall Law School in 2002. He was admitted to the bar of the State of Illinois in May, 2002, and to the bar of the United States District Court for the Northern District of Illinois in May, 2002. From May, 2002 to December, 2004, he practiced labor and employment law as an associate at the law firm of Katz, Friedman, Eagle, Eisenstein & Johnson, former out-of-house counsel to the Laborers' Funds, with the majority of his work being spent representing the Laborers' Funds. In December, 2004, he became in-house counsel for the Laborers' Funds.

2

6.      Based on the foregoing, $225.00 represents a fair and reasonable market rate for my and Jerrod Olszewski's in-house legal services to the Funds in this matter.

7.      Christina Krivanek, in-house counsel for the Laborers' Funds, received a Bachelor of Arts Degree from The Ohio State University in 2002 and a Juris Doctor Degree from the DePaul University College of Law in 2005.  She was admitted to the bar of the state of Illinois in November 2005 and to the bar of the United States District Court for the Northern District of Illinois in January 2006.  In January 2006, she became in-house counsel for the Laborers' Funds.

8.      Based on the foregoing, $225.00 represents a fair and reasonable market rate for Christina Krivanek's in-house legal services to the Funds in this matter.

9.      Amy Carollo, in-house counsel for the Laborers' Funds, received a Bachelor of Arts Degree from Illinois State University in 2000, Masters of Science from University of Illinois at Chicago in 2002 and a Juris Doctor from Chicago-Kent College of Law in 2005.  She was admitted to the bar of the State of Illinois in November of 2005 and to the bar of the United States District Court for the Northern District in January 2006.  In March 2006, she became in-house counsel for the Laborers' Funds.

10.     Based on the foregoing, $225.00 represents a fair and reasonable market rate for Amy Carollo's in-house legal services to the Funds in this matter.

11.     John Hamada, in-house counsel for the Laborers' Funds, received a Bachelor of Arts Degree from University of Illinois at Urbana-Champaign in 2000 and a Juris Doctor from Chicago-Kent College of Law in 2006.  He was admitted to the bar of the State of Illinois in

3

November of 2006 and to the bar of the United States District Court for the Northern District in January of 2007. In February of 2009, he became in-house counsel for the Laborers' Funds.

12.    Based on the foregoing, $225.00 represents a fair and reasonable market rate for John Hamada's in-house legal services to the Funds in this matter.

13.    Elizabeth Haley Douglass, in-house counsel for the Laborers' Funds, received a Bachelor of Arts Degree from Luther College in 2008 and a Juris Doctor Degree from the John Marshall Law School in 2011. She was admitted to the bar of the state of Illinois in November 2011 and to the bar of the United States District Court for the Northern District of Illinois in December 2011. In December 2011, she became in-house counsel for the Laborers' Funds.

14.    Based on the foregoing, $195.00 represents a fair and reasonable market rate for Elizabeth Haley Douglass' in-house legal services to the Funds in this matter.

15.    Exhibit 1 attached hereto sets forth the time expended since April 2, 2013 by Fund Counsel on this matter to enforce the obligations of the Installment Note and move to reinstate the case.. As set forth in that Exhibit, we have expended 6.4 hours totaling $1,292.50 in attorneys' fees.

I, the undersigned, certify under penalty of perjury that the foregoing is true and correct.

Date: __10|25|13__                      _____
                                        Patrick T. Wallace

4

Laborers Pension and Welfare Funds
11465 Cermak Rd.
Westchester, IL 60154


Invoice submitted to:
Jacobs & Sons



October 25, 2013


Invoice #10279


Professional Services

|  |  |  | Hrs/Rate | Amount |
|---|---|---|---|---|
| 4/2/2013 | PTW | Conference with J. Fosco re: Note. | 0.10<br>200.00/hr | 20.00 |
| 4/3/2013 | PTW | Letter to T. Miller; edits; review of Note payments. | 0.20<br>200.00/hr | 40.00 |
| 4/10/2013 | PTW | Telephone call to J. Fosco; telephone call to T. Miller; review of fax. | 0.20<br>200.00/hr | 40.00 |
| 4/15/2013 | PTW | Telephone conference with T. Miller; memo to file re: same. | 0.10<br>200.00/hr | 20.00 |
| 4/17/2013 | PTW | Telephone conference with T. Miller; Telephone conference with JF; Telephone conference with T. Miller. | 0.30<br>200.00/hr | 60.00 |
| 4/19/2013 | PTW | Text to T. Miller; Conference with J. Jorgensen; Conference with J. Fosco; telephone call to T. Miller; Conference with J. Fosco. | 0.40<br>200.00/hr | 80.00 |
| 5/15/2013 | PTW | Telephone conference with T. Miller; memo to file re: same. | 0.10<br>200.00/hr | 20.00 |
| 5/28/2013 | PTW | Telephone conference with T. Miller. | 0.10<br>200.00/hr | 20.00 |
| 6/7/2013 | PTW | Telephone conference with T. Miller. | 0.10<br>200.00/hr | 20.00 |
| 6/11/2013 | PTW | Telephone conference with T. Miller; Telephone conference with T. Miller. | 0.20<br>200.00/hr | 40.00 |



EXHIBIT
C-1
tabbies

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 6/12/2013 | PTW | Telephone conference with T. Miller. | 0.10 200.00/hr | 20.00 |
| 6/17/2013 | PTW | Telephone call to T. Miller. | 0.10 200.00/hr | 20.00 |
| 6/18/2013 | PTW | Telephone conference with T. Miller. | 0.10 200.00/hr | 20.00 |
| 6/24/2013 | PTW | Conference with JM re: payment; telephone call to T. Miller. | 0.10 200.00/hr | 20.00 |
| 7/1/2013 | PTW | Telephone conference with T. Miller. | 0.10 200.00/hr | 20.00 |
| 7/8/2013 | PTW | Telephone call to T. Miller. | 0.10 200.00/hr | 20.00 |
| 7/9/2013 | PTW | Conference with J. Fosco; Telephone conference with T. Miller. | 0.10 200.00/hr | 20.00 |
| 8/13/2013 | PTW | Review of email; Telephone conference with T. Miller; Telephone conference with J. Fosco; memo to file re: same. | 0.30 200.00/hr | 60.00 |
| 8/30/2013 | PGL | Preparation of Notice of Motion, Declaration of Fees; draft Order and exhibits for Motion to Reinstate and Confess Judgment. | 0.40 100.00/hr | 40.00 |
| 9/3/2013 | PTW | Telephone conference with T. Miller. | 0.10 200.00/hr | 20.00 |
| 9/12/2013 | PTW | Edits to Motion and Affidavit of J. Fosco. | 0.50 200.00/hr | 100.00 |
| 9/16/2013 | PTW | Conference with J. Fosco; Telephone conference with T. Miller re: reports. | 0.20 200.00/hr | 40.00 |
| 9/17/2013 | PTW | Edits to Fosco Affidavit; email; letter to T. Miller. | 0.30 200.00/hr | 60.00 |
| 10/2/2013 | PTW | Telephone conference with J. Fosco; edits; email Declaration; Telephone conference with T. Miller. | 0.30 225.00/hr | 67.50 |
| 10/7/2013 | PTW | Edits to Motion; Telephone conference with J. Fosco; Conference with KT; telephone call to T. Miller. | 0.50 225.00/hr | 112.50 |
| | PTW | Edits to Motion; Telephone conference with J. Fosco re: payment; telephone call to T. Miller. | 0.40 225.00/hr | 90.00 |
| 10/14/2013 | PTW | Conference with J. Fosco; Telephone conference with T. Miller. | 0.10 225.00/hr | 22.50 |

| | Hrs/Rate | Amount |
|---|---|---|
| 10/25/2013 PTW  Edits to Affidavit, Motion to Reinstate; Conference with J. Fosco; review of fees. | 0.80 225.00/hr | 180.00 |
| For professional services rendered | 6.40 | $1,292.50 |
| Balance due | | $1,292.50 |

## Timekeeper Summary

| Name | Hours | Rate | Amount |
|---|---|---|---|
| Paralegal | 0.40 | 100.00 | $40.00 |
| Patrick T. Wallace | 2.10 | 225.00 | $472.50 |
| Patrick T. Wallace | 3.90 | 200.00 | $780.00 |